UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * * * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Criminal Action |
| | ) No. 21-539 |
| vs. | ) |
| | ) August 18, 2021 |
| THOMAS JOHN BALLARD, | ) 1:58 p.m. |
| Defendant. | ) Washington, D.C. |

* * * * * * * * * * * * * * *

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

*(Parties appearing via videoconference and/or telephonically.)*

<u>**APPEARANCES**</u>:

FOR THE UNITED STATES:    ROBERT CRAIG JUMAN
                          U.S. Attorney's Office
                          500 East Broward Blvd.
                          Fort Lauderdale, FL 33132
                          (786) 514-9990
                          Email: robert.juman@usdoj.gov


FOR THE DEFENDANT:        ANDREA G. ALDANA
                          Assistant Federal Public Defender
                          Texas State Bar No.: 24111086
                          819 Taylor Street
                          Fort Worth, TX 76102
                          (817) 978-2753
                          Email: andrea_aldana@fd.org


ALSO PRESENT:  MICHELLE M. PETERSON, Federal Public Defender
               for the District of Columbia

               CHRISTINE SCHUCK, Pretrial Agent
               JIMMY BEACHUM, FBI Case Agent

Court Reporter: Elizabeth Saint-Loth, RPR, FCRR
                Official Court Reporter


*This hearing was held via videoconference and*
*telephonically and is, therefore, subject to the limitations*
*associated with the use of technology, static interference, etc.*

Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

1                          **P R O C E E D I N G S**

2                  THE COURTROOM DEPUTY:  Matter before the Court,

3       Magistrate Case No. 21-539, United States of America versus

4       Thomas John Ballard.

5                  Your Honor, for the record, Pretrial Agent

6       Christine Schuck is present via telephone.

7                  Counsel, please state your names for the record,

8       starting with the government.

9                  MR. JUMAN:  Good afternoon, Your Honor.

10      Robert Juman for the United States.

11                 THE COURT:  Yes.  Good morning, Mr. Juman.

12                 And where are you?

13                 MR. JUMAN:  I am in Fort Lauderdale.

14                 THE COURT:  You are in Fort Lauderdale, okay.

15                 Yes.  And for the defense?

16                 MS. ALDANA:  Good afternoon.

17      Andrea Aldana for Mr. Ballard.

18                 THE COURT:  And where are you, Ms. Aldana?

19                 MS. ALDANA:  In Fort Worth, Texas.

20                 THE COURT:  In Fort Worth.

21                 And Mr. Ballard is also in Fort Worth; is that

22      correct?

23                 MS. ALDANA:  Yes.

24                 THE DEFENDANT:  Yes.

25                 THE COURT:  Okay.  Thank you, Mr. Ballard.

1          Okay.  Let me just begin, Mr. Ballard, by stating

2     that this is a hearing; it's being held remotely.  And -- so

3     I want to make sure, Mr. Ballard, that you consent, after

4     consultation with counsel, to be participating in this

5     hearing using videoconferencing technology, rather than

6     being physically transported to Washington, D.C., to be

7     present in the courtroom for the hearing.

8          Do you agree to that?

9          THE DEFENDANT:  I do.  I do.

10          THE COURT:  All right.  I would like to remind

11     anyone listening to this hearing over the public

12     teleconference line that, under my Standing Order 20-20,

13     reordering and rebroadcasting the court proceedings,

14     including those held by videoconference, is strictly

15     prohibited.  Violations of those prohibitions may result in

16     sanctions, including removal of court-issued media

17     credentials, restricted or denial of entry from future

18     hearings, or other sanctions deemed necessary by the

19     presiding judge.

20          All right.  So we're here on the government's

21     motion for review of the Texas magistrate judge's release

22     order in the case of Mr. Ballard.

23          Let me just begin by talking about the items I

24     have reviewed in connection with this review, starting with,

25     of course, the government's motion, docketed at ECF 6; and

1    the defendant's opposition, docketed at ECF 10.  I have also

2    reviewed the criminal complaint in the case, docketed at

3    ECF 1; the Northern District of Texas' pretrial services

4    report that was prepared August 11th.

5            I have also reviewed the transcript of the

6    August 13 detention hearing before the magistrate judge in

7    the Northern District of Texas that has now been docketed at

8    ECF 11; the photo exhibits that were mostly in the

9    complaint, I think, but also posted separately on the docket

10   by the government at ECF Nos. 7 and 9.  And I have also

11   reviewed the video exhibits submitted by the government.

12           Have I missed anything, Mr. Juman?

13           MR. JUMAN:  No, Your Honor.  I think that covers

14   everything.

15           THE COURT:  And, Ms. Aldana, is there anything

16   else that you think I should have looked at?

17           MS. ALDANA:  No, Your Honor.

18           THE COURT:  Okay.  Good.  So it's the government's

19   motion, so I will just begin with the government here.

20           I think the government's moving for detention on

21   two statutory bases, just to make sure I am understanding

22   this correctly; one, under Section 3142(f)(1)(A) because the

23   case involves a crime of violence since the defendant is

24   charged with a violation under 18 U.S.C. Section 111(b);

25   and, also, under Section (f)(1)(E) because the case involves

1    a felony that is not otherwise a crime of violence but

2    involves the possession of a dangerous weapon since he is

3    charged with violating several subsections of 18 U.S.C.

4    Section 1752 while using or carrying a dangerous weapon.

5              Do I have that right, two statutory bases for

6    detention?

7              MR. JUMAN:  Yes, Your Honor.

8              THE COURT:  And you are not raising, and didn't

9    raise before the magistrate judge, any basis for detention

10   that the defendant presents a flight risk or a serious risk

11   of obstruction under 3152(f)(2)(A) or (f)(2)(B); is that

12   correct?

13             MR. JUMAN:  No, Your Honor.

14             I'm sorry.  I believe that it was raised below.

15   Certainly danger is the primary argument; I think the risk

16   of flight was --

17             THE COURT:  Yes.  But it wasn't under -- it

18   wasn't -- you weren't raising a risk of obstruction or that

19   he would threaten, injure, or intimidate a prospective

20   witness or juror under 18 U.S.C. Section 3142(f)(2)(B); is

21   that correct?

22             MR. JUMAN:  That's correct, Your Honor.

23             THE COURT:  Right.  Okay.

24             So let me just start -- given that you are really

25   relying on dangerousness and crime of violence -- with what

1    precisely are the dangerous weapons that the government is

2    asserting that the defendant used on January 6th.

3           And I have looked at the record.  And he had used

4    against the police, allegedly, a police baton, the tabletop,

5    a large piece of wood, a pole, and a strobe light.  So are

6    all of those items what the government considers to be a

7    dangerous weapon or just some of those items?

8           MR. JUMAN:  Your Honor, I think our position is

9    they're all dangerous weapons.  Any item can become

10   dangerous depending on the manner in which it is used; and

11   our position is that all of those items -- Your Honor

12   mentioned a piece of wood.  That piece of wood was broken up

13   into jagged shards and each shard was thrown separately at

14   the police with such force and with such exertion as to make

15   them potentially dangerous weapons.  I would say the same

16   thing for the pole that was thrown.

17          There is also -- I think it's in Exhibit 1G, there

18   was a bottle thrown.  I think -- we would not suggest that

19   that's a dangerous weapon; but the remaining items we are

20   convinced they are dangerous weapons.

21          THE COURT:  Okay.  And is there any new evidence

22   presented at this hearing that was not presented to the

23   magistrate judge, or am I looking at all the same evidence

24   that was before the magistrate judge?

25          MR. JUMAN:  Your Honor, the magistrate judge had

1    everything that's marked as Exhibit 1, including all of its

2    subsets, Exhibit 2, and Exhibit 3.

3              Exhibits 4 and 5 are new.

4              THE COURT:  Exhibits 4 and 5.  Okay.  Just remind

5    me, what are Exhibits 4 and 5?

6              MR. JUMAN:  So Exhibits 4 and 5 are videos --

7    Exhibit 5 is a video of the defendant putting on a gas mask

8    earlier in the day.

9              And Exhibit 4 -- I'm sorry, Your Honor, let me

10   just --

11             THE COURT:  But I think -- I have Exhibit 4 as

12   being photos from the archway the next day; is that

13   incorrect?

14             MR. JUMAN:  Exhibit -- yes.  No.

15             You are right, Your Honor.  I'm sorry.

16             Exhibit 4 is a photo taken the next day which more

17   specifically identifies the large white object that the

18   defendant was shoving under the legs of the officers; that

19   photo indicates that it is, in fact, a piece of the

20   scaffolding that was present that day, and it was left in

21   the tunnel for the time that Exhibit 4 was taken.  That was

22   not presented during the original detention hearing.

23             THE COURT:  Okay.  And, also, Exhibit 5 was not

24   before the magistrate judge?

25             MR. JUMAN:  Correct.

1              THE COURT:  And that's the video of the defendant

2       putting on a gas mask?

3              MR. JUMAN:  Correct; in the presence of the police

4       officers that are present.

5              THE COURT:  All right.  And I think the government

6       has asserted in its motion that Mr. Ballard brought the

7       police baton to the Capitol, and he has asserted that he

8       picked it up while there.

9              Does the government have information that he

10      brought it with him to the Capitol; and, if so, what's the

11      basis for that?

12             MR. JUMAN:  Yes, Your Honor.

13             If I could -- to be precise about it, we do not

14      have evidence that the defendant brought it with him from

15      Texas.  He did claim to the FBI, after his arrest, that he

16      had found it on the ground.

17             We believe that, apart from that self-serving

18      statement, there is no evidence either way.  All we do know

19      for sure, based on the video, is that the defendant had the

20      baton with him.  He had it in his hands --

21             THE COURT:  Excuse me just one second.

22             Could somebody mute?  My court reporter is having

23      a little difficulty hearing because of --

24             THE COURT REPORTER:  Background -- somebody is

25      talking in the background.

1          THE COURT:  -- background noise.  Somebody is

2     talking in the background.

3          Let me just ask you, Mr. Ballard, are there other

4     people in the room with you who are speaking?

5          THE DEFENDANT:  No, ma'am.

6          THE COURT:  No.  Okay.  Hmm.

7          All right.  Well, hopefully it will stop.

8          MR. JUMAN:  I'm sorry, Your Honor.

9          THE COURT:  Okay.  I'm sorry to interrupt you.

10          MR. JUMAN:  No.  No, it's fine.  Let me start

11     again, and hopefully get back there quickly --

12          THE COURT:  I think I get the gist.

13          I think I get the gist; that the government

14     doesn't have evidence, one way or the other, whether

15     Mr. Ballard actually brought the baton with him from Texas

16     or whether, in fact, as he said, he picked it up while he

17     was there; is that right?

18          MR. JUMAN:  It is, Your Honor.

19          But if I could just put a little bit of a finer

20     point on it.  Even if we assume that's correct, that the

21     defendant found an abandoned police baton in Washington,

22     D.C. on January 6th, our point is that someone who did not

23     intend on engaging in violence would have left it on the

24     ground.  Someone who did not intend on engaging in violence

25     would have returned it to the police.

1        What we do know, from that Exhibit 5 that is new,

2    is that the photo -- I'm sorry -- the photo on page 5 of the

3    motion and video Exhibit 1A is that the defendant was

4    brandishing this baton long before he chose to use it and

5    long after it became clear that the rioters were attacking

6    the police.

7        So whether the defendant's planning occurred days

8    earlier or hours earlier, the point is that he planned to

9    use that baton against law enforcement; that's the

10   government's point.

11       THE COURT:  Okay.  And when law enforcement

12   searched Mr. Ballard's house they found, as I understand it,

13   a gas mask.  Did they find the police baton?

14       MR. JUMAN:  They did not; just the gas mask.

15       THE COURT:  Okay.  And what about the strobe

16   light, was that found in the search of his house?

17       MR. JUMAN:  Your Honor, I have Special Agent

18   Beachum on the line; he will correct me if I am wrong.

19       I don't believe that the strobe light was found.

20   It was a small flashlight; one of the photos shows it in the

21   defendant's hand.  I don't know if it was found during the

22   search.  I am not aware that it was.

23       THE COURT:  Okay.  This is the first case arising

24   out of January 6 where I have had information about a strobe

25   light being used.

1          Could you explain the government's position that

2     the strobe light had the potential to incapacitate law

3     enforcement?

4          MR. JUMAN:  Yes, Your Honor.

5          I think the use of the strobe light, we would

6     submit, is meant to distract.  It's difficult enough for the

7     officers to see what is going on.  If someone is shining a

8     strobe light in their faces, it makes it that much more

9     difficult.

10          This is tied to the government's position that the

11     defendant's conduct was not just assaultive, but it

12     demonstrated a level of strategic maneuvering.  The use of

13     the -- of what we now know is scaffolding to disrupt the

14     legs of the officers, the shining of the strobe light in the

15     face of the officers -- all of that is not necessarily

16     assaultive conduct, but it is part and parcel of a scheme to

17     distract and make it harder for the officers to defend

18     themselves against the other attacks that were going on at

19     the same time.

20          And if you watch the videos -- candidly, some of

21     this has to be seen from the perspective of the other side

22     when you're looking into the light; but it does make it very

23     difficult to see what is going on it.  It makes it difficult

24     to see an object coming towards you, a police baton coming

25     towards you.  It just generally makes the police officer's

 1    job even harder than it was that day.

 2              THE COURT:  Is that because the strobe light with

 3    the, sort of, flashing on and off flicker makes -- when it's

 4    directed at a person's face makes that person blink or close

 5    their eyes?

 6              MR. JUMAN:  I guess the best analogy, Your Honor,

 7    I can use is if you're driving on the highway and someone in

 8    the opposite lane has high beams on.  Any light, whether

 9    it's blinking or not, is going to be distracting.

10              I think the use of the strobe effect is more

11    distracting.  But any kind of light being shined in your

12    eyes is going to cause some level of distraction.

13              THE COURT:  All right.  And so what actually

14    happened on this lower west terrace entryway with the police

15    line there being subjected to not just the activity by this

16    defendant but others?  Was there a break through that line,

17    or did that police line hold?

18              MR. JUMAN:  Your Honor, that line held.

19              From approximately 2:40 p.m. until about 5:02 or

20    5:03 p.m. there was just a constant pitch battle between the

21    rioters and the police inside the archway.  There were

22    moments -- at times when the police line moved back and

23    forth; but at no time did the rioters break through.  There

24    were moments when officers were dragged out; numerous

25    instances of items being thrown; people attacking the police

1    with baseball bats and other items, including the baton, in

2    the case of this defendant.  But, for about two and a half

3    hours, it was basically a constant pitch battle.

4            THE COURT:  Okay.  And has the government

5    uncovered any evidence that this defendant ever entered the

6    Capitol Building, or is the investigation still continuing

7    on that front?

8            MR. JUMAN:  Your Honor, it is still continuing.

9    We do not at this time have any evidence that the defendant

10   either passed the lower west terrace; we have no information

11   he was in that area.  We have no information that he

12   appeared in the upper -- or breach other points in the

13   Capitol.

14           THE COURT:  All right.  So one of the things that

15   the government pointed out in its papers, in the photograph,

16   and also mentioned at the detention hearing is that, in a

17   search of Mr. Ballard's phone, they found a photo with a

18   sign saying:  The Constitution actually says you can legally

19   overthrow your government if they were tyrannical.  That

20   photo is at page 11 of the government's motion.

21           What is the government actually trying to show

22   with that photograph?  I mean, what's the context of that

23   particular image, if you know?

24           MR. JUMAN:  Right.  Your Honor, the point simply

25   there is really more about the date than anything else.

1    Obviously the defendant is free to believe whatever he wants

2    and he is free to express those beliefs however he wants.

3         But in this particular case, the day after the

4    riot, in which the defendant participated in attacking the

5    police physically, repeatedly, and violently -- what that

6    image shows is that on January 7 he did not feel remorse for

7    his conduct.  He felt that his conduct was justified.  In

8    fact, he still believes his conduct is justified, and that's

9    what that quote goes to; in particular, the defendant's

10   status, he believes, vindicates his decision for using

11   violence against the police.

12        THE COURT:  I see.  So the date that photograph

13   was taken on -- the metadata in the photograph said it was

14   taken on January 7th?

15        MR. JUMAN:  The date on the phone listed -- when

16   you look through the photographs on the cell phone, they

17   have a date at the top; and this one was dated January 7.

18        THE COURT:  I see.  Okay.

19        So there are a couple things that even the

20   magistrate judge in Texas thought was troubling.  And I

21   wondered whether the government has any additional

22   information about these two particular things that were

23   raised at the hearing below; one was that the defendant shot

24   dead a neighbor's dog with a gun he regularly carries; and,

25   two, that Mr. Ballard was a member of a militia

1    organization.

2              So let's start with the dog.

3              MR. JUMAN:  Yes, Your Honor.

4              THE COURT:  Unless I missed it in the transcript,

5    I didn't see any date when that incident occurred.  I didn't

6    see anything else about that incident.  So do you have

7    anymore information about that incident?

8              MR. JUMAN:  We do, Your Honor.  And I am trying to

9    pull it up.  This morning we received a copy of a police

10   report.

11             THE COURT:  Of the what report?  I'm sorry.

12             MR. JUMAN:  The police report from Texas that was

13   filed in connection with the incident.  Here I go.

14             I have provided it to defense counsel.

15             The date is March 15th, 2020.

16             THE COURT:  And it was a police report filed by

17   whom?

18             MR. JUMAN:  An Officer Martinez from the Fort

19   Worth police department.  He reported to the scene.

20   Apparently someone called the police regarding the incident;

21   and this officer appeared and conducted an investigation and

22   prepared a report.

23             THE COURT:  Well, do you have anything else to add

24   about this incident?

25             MR. JUMAN:  Your Honor, well, I can add -- first

1    of all, obviously, that the officer decided that there was

2    no crime; they did not pursue the case any further than

3    this.  I am looking at the description -- the narrative

4    section of the report right now -- which, again, we have

5    provided to defense counsel.

6         It says that the officer arrived on the scene,

7    made contact with the defendant who had shot the dog.  The

8    defendant said he had been in the garage when he heard

9    screaming from the kids that normally play outside in the

10   street.  Going outside to investigate the screaming,

11   defendant saw a big, black/brown dog that was chasing some

12   kids up onto a car in the street.  The defendant yelled at

13   the dog trying to shoo it away.  The dog came after him and

14   lunged at him several times, chasing him up his driveway.

15        Defendant -- fearing for both his safety and the

16   safety of others, defendant drew his Glock 19 handgun and

17   fired one 9mm Spear Gold Dot round in the dog.  The dog died

18   a few minutes after the officer arrived on the scene.

19        THE COURT:  Okay.  And is the government

20   presenting that evidence of that dog shooting for any

21   reason?

22        MR. JUMAN:  No, Your Honor.  I understand that did

23   show up in Texas.  We have since obtained the police report,

24   but I don't think it bears on the Court's decision today.

25        THE COURT:  Okay.  So then the second thing was

1    Mr. Ballard's membership in a militia in Texas.

2            And do you have any additional information about

3    that, or when -- what kind of militia it was, or any other

4    information about that?

5            MR. JUMAN:  Your Honor, I don't know much more

6    than what was presented at the detention hearing.  Again,

7    Special Agent Beachum may know more or correct me if I'm

8    wrong.

9            My understanding is that it was for several years

10   prior.  It's something that has been told to law enforcement

11   about, and it was an organization known to law enforcement.

12   And the defendant told the FBI he didn't leave because he

13   objected to the violence or anything like that, but because

14   he didn't agree with the internal drama taking place within

15   this particular militia group.

16           THE COURT:  And is this a militia group that was

17   prone to violence?  And was it -- I mean, what kind of

18   militia organization?

19           MR. JUMAN:  Your Honor, if I could ask Agent

20   Beachum to turn on his microphone, I think he's better

21   equipped to answer that.

22           THE COURT:  I would appreciate that.

23           MR. JUMAN:  Agent Beachum, can you -- there we go.

24           THE COURT:  Agent Beachum, I am going to just put

25   you under oath.

1          AGENT BEACHUM:  Yes, Your Honor.

2          THE COURT:  So you are just on the telephone?  You

3    are not on the videoconference?

4          AGENT BEACHUM:  I am on the video.  Can I turn on

5    my video, Your Honor?

6          THE COURT:  Yes, please.

7          All right.

8          THE COURTROOM DEPUTY:  Agent Beachum, could you

9    please raise your right hand.

10          (Whereupon, Agent Jimmy Beachum was sworn.)

11          THE COURTROOM DEPUTY:  Thank you, sir.

12          THE COURT:  All right.  Thank you.

13          So does the government want to elicit additional

14    information from Agent Beachum about the militia reference

15    that was made, I think, at the magistrate judge's hearing --

16    I think also in the government's motion -- so that I can

17    understand why this is probative of dangerousness?

18          MR. JUMAN:  Yes, Your Honor.  Let me try it this

19    way.

20                         DIRECT EXAMINATION

21    BY MR. JUMAN:

22    Q.  Agent Beachum, you have heard all of the Court's

23    questions about the militia that was referenced by the

24    defendant in his postarrest statement to you, correct?

25    A.  Yes.

1  Q.  Do you know which militia the defendant was referring

2  to?

3  A.  Texas State Militia, yes.

4  Q.  Is that a militia organization that you are aware of

5  that was under investigation by the FBI prior to the events

6  in this case?

7  A.  We don't investigate the militia, sir, as a whole, no.

8  Q.  Is there anything that you can provide the Court

9  regarding this militia?  Do you know anything about it that

10  would be relevant to today's proceeding?

11  A.  No.  I just know that Mr. Ballard stated that he joined

12  the militia in order to receive further tactical training.

13            THE COURT:  Okay.  This is called the Texas State

14  Militia, is that right, Agent Beachum?

15            THE WITNESS:  Yes, Your Honor.  Yes, Your Honor.

16            THE COURT:  Okay.  And is it -- does it have any

17  political or other kinds of purpose that would be relevant

18  here?

19            THE WITNESS:  No, Your Honor, because each

20  member -- I mean, we don't -- because we don't investigate

21  militias as a whole, it would be on an individual basis.  So

22  there is -- I don't have any reason to believe that the

23  militia would take a political stance that would pertain to

24  this investigation.

25            THE COURT:  All right.  Why does the government

 1    mention the militia if you don't know anything about it?

 2              You don't know when Mr. Ballard was in the

 3    militia.  What is the purpose of bringing it up?

 4              MR. JUMAN:  Your Honor, merely to show the

 5    defendant has sought and obtained additional training in the

 6    use of weaponry.

 7              THE COURT:  Okay.  I think -- Mr. Ballard, are you

 8    still able to hear?  I think we're having a technical

 9    difficulty.

10              (No audible response.  Technical difficulties.)

11              THE COURT:  My courtroom deputy is trying to

12    contact the facility where Mr. Ballard is being held to

13    re-establish a connection.

14              MS. ALDANA:  Your Honor, if I may, I also have the

15    cell phone of the officer he is with, and I just texted her

16    letting her know that we have lost him.

17              THE COURT:  Thank you so much.

18              THE COURT REPORTER:  May I have Officer Beachum's

19    first name?

20              THE COURT:  Yes.

21              Officer Beachum, could you please state your first

22    name?

23              THE WITNESS:  Jimmy.

24              MS. ALDANA:  Your Honor, the officer with him says

25    that they will restart.

```
 1              THE COURT:  Thank you.
 2              (Whereupon, the proceeding paused.)
 3              THE COURT:  Ms. Aldana, have you received any
 4   recent texts from them because my courtroom deputy is not
 5   getting a response to her emails.
 6              MS. ALDANA:  No, Your Honor, I have not.
 7              MS. PETERSON:  Your Honor, this is Michelle
 8   Peterson.  Might I inquire whether the Court needs me to
 9   remain on the line?
10              THE COURT:  Ms. Peterson, you do not need to be
11   here.  I am sorry.  I didn't know.  I am sure you have many
12   other things to do.
13              MS. PETERSON:  Thank you, Your Honor.
14              THE COURT:  You are excused.
15              MS. PETERSON:  I will excuse myself then.  Thank
16   you very much.
17              THE COURT:  Thank you.
18              Ms. Aldana, do you have the phone number of the
19   institution because my courtroom deputy is having trouble
20   finding the number for it.
21              MS. ALDANA:  Not of the institution, just the
22   personal phone number of the officer he is with; however,
23   another attorney with our office will call her right now.
24              THE COURT:  Okay.  Thank you.
25              MS. ALDANA:  Yes, ma'am.
```

1          THE COURT:  Well, Mr. Ballard is in the custody of

2     the Attorney General.  Mr. Juman, what are you doing to get

3     a hold of him and get him back online for this hearing?

4          MR. JUMAN:  Your Honor, I am happy to pursue

5     whatever phone numbers Ms. Aldana has.  I am happy to

6     officer my services.  Unfortunately, I don't believe I have

7     any better information than the courtroom deputy.

8          THE COURT:  Do you know where he's being held?

9          MR. JUMAN:  We do have that information.

10         THE COURT:  Well, why don't you call the

11    commandant of that facility or the head of that facility and

12    tell them that there is a hearing being held up because a

13    defendant in the custody of the Attorney General is not

14    appearing for his hearing.

15         MR. JUMAN:  I will do that right now, Your Honor.

16         I am on my computer now looking for that

17    information.  It's the Parker County Jail.  So I will look

18    up a phone number for the Parker County Jail.

19         MS. ALDANA:  I have posted the number in the chat

20    just so that it would be easy to see.  We are on the phone

21    with them right now; it seems like their internet may have

22    gone down.  We do have a storm going through the area, so

23    that could be part of the issue.

24         THE COURT:  Mr. Juman, why don't you mute

25    yourself.

```
 1              THE COURTROOM DEPUTY:  They are back, Your Honor.

 2              THE COURT:  They're back?

 3              Okay.  They're back, excellent.

 4              UNIDENTIFIED OFFICER:  Sorry, ma'am.

 5              Can you hear us now?

 6              THE COURT:  Yes.

 7              UNIDENTIFIED OFFICER:  Conference room.  Okay.

 8              THE COURT:  Thank you.

 9              UNIDENTIFIED OFFICER:  You're welcome.

10              THE COURT:  All right.  Mr. Ballard, welcome back.

11              THE DEFENDANT:  Thank you.

12              THE COURT:  Okay.  So, Mr. Juman, the defendant

13     does have two prior arrests.  Are both of those

14     misdemeanors?  One for evading arrest -- detention with a

15     vehicle, and one for unlawful carrying of a weapon; are both

16     of those misdemeanors?

17              MR. JUMAN:  Yes.  Your Honor, my understanding is

18     the evading arrest was a felony and the unlawful possession

19     of a weapon was a misdemeanor.

20              THE COURT:  A misdemeanor, I see.  Okay.

21              And I think the magistrate judge in Texas noted --

22     certainly Ms. Aldana argued in Texas that, since

23     January 6th, Mr. Ballard has had no contact with law

24     enforcement and has essentially stayed out of trouble for

25     the last seven months or so.  So how should I view that in
```

1    terms of evaluating his dangerousness?

2         MR. JUMAN:  Well, Your Honor, if somebody walked

3    up to a police officer on the street and hit him over the

4    head with a police baton, I don't think we would hesitate in

5    saying that person was dangerous.  The fact that the

6    defendant hasn't traveled to Washington, D.C., a second

7    time, the fact that he hasn't done the exact same thing on

8    January 6th, doesn't change the analysis.

9         I don't have to inform Your Honor about the

10   *Chrestman* factors.  We can assume that both of those

11   factors -- if you look at the defendant's conduct, that's

12   enough; that establishes the defendant's danger.

13        The problem is that we don't know when the

14   defendant will decide if something bothers him enough that

15   he wants to use violence because he doesn't believe in the

16   law that exists or he's subjected to something that a

17   government agency is doing -- the fact is that the defendant

18   has made -- by his actions has made it clear that he doesn't

19   respect the rule of law; that's what creates the danger

20   here.  He is willing to use violence in pursuit of his

21   goals.  The fact that, I mean, this happened in the past

22   couple of months, it hasn't bothered him enough, doesn't

23   really change the calculation.

24        THE COURT:  Well, after I decided *Chrestman* and

25   set out those factors, the D.C.  Circuit decided *Munchel*.

1    And in *Munchel* -- which, of course, involved two individuals

2    with zip ties and a Taser on the Senate floor on

3    January 6th -- and the Circuit there said that:  In order to

4    detain an individual for dangerousness, the Court must

5    identify an articulable threat posed by the defendant to an

6    individual or the community outside the context of

7    January 6th.

8            So it wasn't enough to say that the defendant,

9    because of political motivations on January 6th, posed a

10   danger and carried dangerous weapons even to the central

11   part of -- the inside of the Capitol Building on the Senate

12   floor.  But you had to -- in *Munchel,* they remanded that

13   case for the district court to make findings about why the

14   defendants continued to show an articulable threat to the

15   individual or community outside of the January 6th events.

16           So how would I meet that standard here when the

17   defendant has been out for seven months without -- other

18   than this photograph on January 7th -- not even social media

19   postings that have been inflammatory, and certainly had no

20   contact with law enforcement after January 6th?

21           MR. JUMAN:  Your Honor, I think that the reading

22   of *Munchel* -- we would suggest to you -- is that *Munchel,* as

23   well as subsequent cases by the Circuit, have really drawn a

24   very clear line between those who engaged in violence and

25   didn't.

1          It is true that the Court in *Munchel* said you need

2     to evaluate the defendants outside of January 6th.  But,

3     remember, the *Munchel* defendants had not engaged in

4     violence.

5          In *Munchel,* the Court made clear that those who

6     actually assaulted police officers are in a different

7     category of dangerousness than those who simply cheered on

8     the violence.  They drew this category of distinction which

9     has continued through the most recent pronouncements -- if

10    you compare the Court's decision in the *Khater*, K-H-A-T-E-R,

11    case versus the most recent pronouncement in *Tanios*, for a

12    codefendant that didn't engage in violence.

13         They have -- I'm sorry, I am getting some

14    interference.  Can the Court still hear me?

15         THE COURT:  Yes.  I can hear you fine.

16         MR. JUMAN:  Okay.

17         So I think the answer is that the defendant's

18    conduct on January 6 was violent, and that does put him in a

19    different category, putting aside the events that have taken

20    place after January 6th, his other comments, his

21    photographs -- other incidents the Court can look at in

22    terms of his behavior; that is our reading of *Munchel*.  I

23    think it's consistent with the D.C. Circuit Court's

24    pronouncements since then.

25         THE COURT:  All right.  Is there anything else

1    that you want to add?  You can have a reply once I speak to

2    Ms. Aldana.

3         MR. JUMAN:  Your Honor, I think you have hit all

4    the major points.

5         I don't know that I need to -- I am happy to argue

6    through the *Chrestman* factors and the other factor within

7    3142; I think they all obviously push in favor of detention.

8         We also would just note that the -- one issue that

9    stood out to me, when I reviewed the transcript of the

10   detention hearing, was that the defendant -- when he spoke

11   to the FBI, and he did so voluntarily -- he didn't have to

12   talk to them.  But when he did -- and when they asked him

13   about his assault on the police officers, he didn't deny it

14   and he didn't admit it; he said, "I don't remember."

15        The reason that's troubling, I think, is because

16   that suggests either that he was lying to the FBI, which is

17   bad, or that this kind of behavior simply didn't rise to the

18   threshold of something he would pay attention to which would

19   be even worse.

20        I submit it's even likely he seemed to be candid

21   with the officers; but, remember, that's the only basis we

22   have on the record for the claim he didn't bring the baton

23   with him, in terms of preparation; and it suggests, again,

24   that he simply doesn't have respect for the rule of law,

25   doesn't have respect for the FBI, and is willing to let his

1    personal beliefs override that rule of law.

2              THE COURT:  All right.  Thank you.

3              So, Ms. Aldana, why don't you just pick up with

4    the last two cases that Mr. Juman mentioned, *Khater* and

5    *Tanios.  Khater* was decided July 26th; *Tanios* was decided

6    August 9th.  So they are two of the D.C. Circuit's most

7    recent decisions on detention regarding defendants due to

8    actions or conduct on January 6; and these two decisions do

9    seem to point in different directions because both Khater

10   and Tanios were codefendants.  And the district court

11   detained both of them because Tanios bought and brought to

12   the Capitol, on January 6, chemical spray and then supplied

13   that chemical spray to his codefendant Khater who then used

14   the spray directly at police officers which resulted in

15   disabling three police officers and, certainly, other

16   officers who had to take care of them, leaving holes in

17   their protective line.

18             One panel of the D.C. Circuit affirmed the

19   pretrial detention order for Khater, the one who actually

20   sprayed the chemical spray directly in the faces of the

21   police officers.

22             A different panel reversed the pretrial detention

23   order of Tanios and didn't even remand it; it was directed

24   that Tanios, who bought and brought the chemical spray to

25   the Capitol, supplied it to Tanios to use, who was charged

1    with a conspiracy -- a different panel directed that Tanios

2    be released.

3             So in *Khater* the panel agreed with the pretrial

4    detention for that defendant because he actually used the

5    chemical spray to violently assault multiple police officers

6    and emphasized the violent nature of the defendant's assault

7    on law enforcement, and the flagrant -- and I quote:

8    Flagrant disregard of authority and disrespect for law

9    enforcement that that activity entailed.

10            And for the codefendant Tanios, a different panel

11   of the D.C. Circuit thought it was conclusive that this

12   particular co-conspirator, Tanios, had no past felony

13   convictions, no ties to any extremist organizations, and no

14   post-January 6th criminal behavior that would otherwise show

15   him to pose a danger to the community within the meaning of

16   the Bail Reform Act.  So district courts here -- district

17   court judges are left to figure out -- thread that needle of

18   *Tanios* and *Khater*.

19            And let me ask you, Ms. Aldana, do you think that

20   the combination of the three things that the *Tanios* panel

21   mentioned:  No post felony convictions, no ties to an

22   extremist organization, and no post-January 6th criminal

23   behavior should be determinative on the detention decision?

24            MS. ALDANA:  Largely so, Your Honor, yes, because

25   I think that that answers directly the question of whether

1    there is articulable threat outside of the events of

2    January 6th on this individual.

3         Mr. Ballard did not bring the gas mask in

4    anticipation of engaging in violence.  He reviews

5    alternative news sources, and he was of the belief that

6    there would be counter protesters there, not government

7    officials, that would engage in physical violence with

8    things such as chemical spray.  He did not bring chemical

9    spray; and the government has not provided any evidence that

10   he has actually brought the police baton that is seen in the

11   video.

12        We do see in the video, however, other individuals

13   who aren't police with police helmets and shields,

14   suggesting not that there was a cache of police gear lying

15   around, but that there were items that were either

16   disregarded or left behind by officers.

17        THE COURT:  So let me just stick with *Tanios* for a

18   second because one reading of *Tanios* and *Khater* -- this

19   parallel set of panel decisions from the Circuit, is that

20   the Circuit -- these two decisions can be reconciled because

21   Tanios had not himself sprayed the officer with a chemical

22   spray that Tanios bought and brought to the Capitol, but was

23   merely a co-conspirator, an aider and abetter, of Khater;

24   and that if you actually used the spray -- if you actually

25   engage in direct violence with law enforcement, then *Tanios*

1    can be distinguished in the world of *Khater* where the

2    Circuit panel agreed that pretrial detention was appropriate

3    for a person who violently assaulted the police officers.

4         So if that's the reading of *Khater* and *Tanios*

5    together, why doesn't this defendant fall in the *Khater*

6    realm, as opposed to the *Tanios* realm, even if I credit your

7    argument that his bringing up a gas mask to the Capitol

8    Building on January 6th was not an indication of preplanning

9    for violence?

10         So isn't your struggle here to distinguish

11   Mr. Ballard from *Khater* and not *Tanios*?

12         MS. ALDANA:  Yes, Your Honor.

13         And, still, I don't believe that Mr. Ballard can

14   fit within either cases exactly.  In a lot of the videos in

15   the exhibits we see him shuffling around, milling about with

16   a large number of individuals until a brief engagement with

17   the officers in the front; and, still, he is behind other

18   people.

19         So I am not sure his engagement rises to that of

20   an individual using a paralyzing substance directly in the

21   face of police officers.

22         THE COURT:  Well, that's interesting.  Because, I

23   mean, I have looked at all of the videotapes and -- even in

24   the body-worn camera, and you can see Mr. Ballard's face

25   right there, in fact, holding the baton.  So certainly there

 1    were lots of other people around him.  But he was pretty

 2    much at the front line there because you got a very good

 3    look at him.

 4            So you are saying he was never at the front line?

 5            MR. JUMAN:  No.  That there were other

 6    individuals at times in front of him --

 7            THE COURT:  With him there.

 8            MS. ALDANA:  Yes.  But at times, in front of

 9    him -- at times he was behind attempting to find a space to

10    fit.  It's distinguishing between having a distance where

11    you can spray a chemical spray versus being behind these

12    shields.

13            THE COURT:  Well, let me just deal with this gas

14    mask issue.  I do understand your argument that it's not

15    necessarily evidence of advanced planning for a violent

16    encounter with the police.  But that -- I think your

17    argument is that he was expecting counter protesters to be

18    the ones sprayed by the tear gas by the police, not him; is

19    that what the argument is?

20            MS. ALDANA:  I believe tear gas being used upon

21    individuals who were there attending the original rally

22    earlier in the day by counter protesters.

23            THE COURT:  Well, I mean, if there are --

24            MS. ALDANA:  I understand how that is obviously

25    not what occurred; nor is it what several individuals

1    believed, who have other sources of information; but that

2    was Mr. Ballard's belief.

3              THE COURT:  Uh-huh.  Well, I don't see why it is

4    such a stretch to believe that somebody who comes prepared

5    to Washington, D.C. to participate in a peaceful rally

6    doesn't typically bring a gas mask.  And a gas mask is to be

7    prepared if you are going to engage in violence and the

8    police react with nonlethal force to that violence by using

9    gas rather than lethal force; that's why you have a gas mask

10   with you.  You're -- I mean, it does seem to me that it's a

11   little bit of a stretch to say that he didn't bring a gas

12   mask to protect himself from the police but from others,

13   particularly given where he was standing, at the very front

14   of this huge mob, outside the Capitol.

15             Let me just say, the defendant's opposition memo

16   says very little about the video evidence or the conduct

17   description that are really at the core -- the heart of the

18   government's request for pretrial designation based on the

19   defendant's dangerousness.

20             Other than what you have already said at the

21   hearing today, do you have any other argument about the

22   nature or the circumstances of this offense other than

23   that -- I guess, in your perspective of looking at the

24   videos and the photos -- your position is that Mr. Ballard

25   wasn't at the front of the line.  But do you have any other

1    argument about this fairly significant offense conduct?

2           I think you also said that you thought that it was

3    a brief period of time.  From my looking at the timing on

4    the videotapes, wasn't it almost 15 minutes that he engaged

5    in this standoff with police, throwing objects at them?

6    That's not a very short period of time.

7           MS. ALDANA:  No, Your Honor.

8           "Brief," in terms of the large amount of time that

9    there were individuals on that lawn.

10          THE COURT:  So -- could you say that again?

11          MS. ALDANA:  "Brief," in relation to the span of

12   time that there were individuals on that lawn which I

13   believe was for several hours.

14          THE COURT:  I see.  Okay.

15          I mean, there have been defendants who have had

16   physical altercations with police officers who have been

17   released, but those have been people who have had like brief

18   encounters.  When I say "brief," I mean, seconds long

19   encounters, as opposed to a sustained frontline attack with

20   multiple objects over an almost 15-minute period.

21          So I am curious about how you would frame that

22   interaction that Mr. Ballard had with the police on

23   January 6th as something that was fairly minor.

24          MS. ALDANA:  No, Your Honor.  I don't believe

25   there are too many different ways to frame that.

1          I just would rather point to the lack of planning

2     prior to the time he arrived at the Capitol, the lack of

3     coordination of the individuals in advance of the events,

4     and just his activity afterwards.

5          THE COURT:  All right.  So you do say, in your

6     opposition memorandum, that the government lacks -- and I

7     quote:  A supporting evidentiary basis for the assertion

8     that the government makes that the defendant has a lack of

9     regard for the law.

10         Do you think the government is wrong to look to

11    the offense conduct of this fairly bold fighting directly

12    with law enforcement to break up a police line as showing

13    disrespect for the law?  Isn't that, sort of, a very obvious

14    disrespect for the law?

15         Why isn't that a sufficient supporting evidentiary

16    basis for the assertion that he lacks a regard for the law?

17         MS. ALDANA:  Your Honor, that was specific to his

18    ability to follow conditions after this event; to the

19    comments that he lied to police officers about his memory,

20    that he arrived with the baton -- because I believe that was

21    suggested in the language -- as well as the militia

22    comments, without further information, as we discovered

23    today, there is not much to get into to support continued or

24    previous planning.

25         THE COURT:  All right.  And do you know how long

1    the defendant had been in the militia and how long it had

2    been since he had left the militia?

3              MS. ALDANA:  It is my understanding not long, Your

4    Honor, but I can't give you a specific time frame.  I do

5    know that he left over seven years ago.

6              THE COURT:  Okay.  Was it the Texas State Militia

7    that he had belonged to?

8              MS. ALDANA:  I am not sure, Your Honor.

9              THE COURT:  Okay.  All right.

10             Mr. Juman, do you want an opportunity for a

11   response?

12             MR. JUMAN:  Yes, Your Honor.

13             Yes, Your Honor, just a couple of items.

14             First, the defense argued that the defendant

15   brought the gas mask because he anticipated the presence of

16   counter protesters.  Again, our point is that -- if you

17   watch the video that's been submitted as Exhibit 5 which is

18   new -- that shows him putting on the gas mask long after it

19   was clear there were no counter protesters, it was just the

20   rioters attacking the police; so that really puts -- belies

21   any claim that that was the purpose of the gas mask.

22             To get at Your Honor's questions about the

23   *Khater* -- I hope I am pronouncing that right -- case, and

24   *Tanios* -- I think -- a couple of things.  First, it's very

25   clear that the D.C. Circuit is not trying to establish any

1    hard and fast rulings.  If anything, it comes across that an

2    individualized determination has to be made in every case.

3              The issue is that where a defendant did not engage

4    in violence on January 6th, that individualized

5    determination has to be based on something.

6              But when you read the *Khater* case, it's clear that

7    the individualized determination that the D.C. Circuit

8    upheld was based entirely on the defendant's conduct,

9    violent conduct, on January 6th.  There is no reference in

10   *Khater* to what the defendant had been doing since then.

11   There is no reference to anything but the fact the defendant

12   had engaged in significant violence -- repeated acts of

13   violence on January 6th; and that -- again, the Court still

14   had to make an individualized determination from the

15   D.C. Circuit saying that was a permissible determination

16   because the actions on that day were so violent.  Here,

17   that's what we have.  If anything, we have a defendant who

18   is more violent than the defendant in *Khater*.

19             The defense has made some suggestion that somehow

20   the use of gas is worse than what the defendant did here.  I

21   don't think that it's by any means clear that someone would

22   rather be hit on the head with a police baton than sprayed

23   with some kind of chemical spray; but, again, that's not

24   really the issue.  There is no gradation of violence.

25             The point here is the defendant engaged in

1    repeated acts of violence for well -- over the span of,

2    like, 15 minutes, which is -- when you watch these videos,

3    it is almost like an eternity.

4           Lastly, Your Honor pointed out that the defendant

5    was not just in the back; he was not just cheering on the

6    violence; he was front and center, and I think this goes to

7    the *Chrestman* factor of leadership.  And we are not

8    suggesting that he was using words as a leader, but

9    *Chrestman* is very clear; you can have a de facto leadership

10    role.  By putting yourself in front and engaging in that

11    kind of violence, in view of all of the rioters in the

12    background, you are really encouraging those rioters.  You

13    are really acting in a de facto role.

14           Also, his conduct was not insignificant; it was in

15    conjunction with others.  *Chrestman* also points to that

16    factor; in coordination with others.  Again, it was an

17    explicit -- it wasn't verbal; but the fact is that the

18    defendant's attacks and, as we pointed out, the use of the

19    strobe light, his attempts to trip the officers with the

20    piece of scaffolding -- all of that goes towards an unspoken

21    coordination with other rioters who were attacking those

22    officers at that archway at the same time.

23           So, again, for all of those reasons, we think that

24    the evidence is clearly sufficient to warrant a finding for

25    detention.

1          THE COURT:  All right.  The Court is ready to rule

2     on the government's motion to review the Northern District

3     of Texas magistrate judge's decision to release the

4     defendant pending trial.

5          I am going to begin with the legal standard that

6     applies here.  On an appeal from a magistrate judge's order

7     of pretrial release, the district court must conduct a

8     *de novo* review and must do so "promptly."  See 18 U.S.C.

9     Section 3145(a).

10          To accomplish this review "promptly," this hearing

11     is being conducted remotely rather than to wait for

12     Mr. Ballard to be transported to Washington, D.C., for the

13     hearing to be held here in the District or in this

14     courthouse.

15          Neither 18 U.S.C. Section 3142 nor Section 3145

16     specifies the standard of review to be applied by a district

17     court reviewing a magistrate judge's release or detention

18     order.  And the D.C. Circuit has declined to decide the

19     standard applicable to the district court's review of a

20     magistrate judge's release order, and whether the magistrate

21     judge's factual or other findings are entitled to any

22     deference.

23          Most recently, the D.C. Circuit declined to decide

24     the standard in the *Munchel* decision issued in March 2021.

25          Nonetheless, for years, this Court has exercised

1      *de novo* review, based on the text and structure of the Bail

2      Reform Act; and the weight of authority from every other

3      circuit to consider this critical issue, and every other

4      circuit has held that *de novo* review applies.  These

5      decisions from other circuits are all collected in my

6      *Chrestman* decision at 2021 Westlaw 765662, at footnote 5; it

7      was issued in February of 2021.

8              I will apply *de novo* review here.

9              The Bail Reform Act requires release of a

10     defendant prior to trial unless a judicial officer

11     determines, after a hearing, that no condition or

12     combination of conditions will reasonably assure the

13     appearance of the person as required and the safety of any

14     other person and the community.  See 18 U.S.C. Section

15     3142(e)(1).

16             The government bears the burden to establish by a

17     preponderance of the evidence that the defendant poses a

18     serious risk of flight or a serious risk of obstruction or

19     attempt to obstruct justice, or intimidate or threaten a

20     prospective witness, or show, by a clear and convincing

21     evidence, that no conditions of release will assure the

22     safety of any other person or the community.  See 18 U.S.C.

23     Section 3142(f)(2).

24             In determining whether any condition -- or release

25     condition of the appearance of the person as required and

1    the safety of others, the Court must take into account the

2    available information concerning four factors that are set

3    out in Section 3142(g) of the Bail Reform Act; these factors

4    are:

5         The nature and circumstances of the offense

6    charged; the weight of the evidence against the person; the

7    history and characteristics of the person, including the

8    person's character, physical or mental condition, family

9    ties, employment, financial resources, length of residence

10   in the community, community ties, past conduct, history

11   relating to drug or alcohol abuse, criminal history, and the

12   record concerning appearance at court proceedings; and,

13   finally, the nature and seriousness of the danger to any

14   person or the community that would be posed by the person's

15   release.

16        The D.C. Circuit's decision in *Munchel* indicated

17   that to detain an individual for dangerousness, the Court

18   must -- and I quote -- "Identify an articulable threat posed

19   by the defendant to an individual or the community," outside

20   the context of January 6th.  See *U.S. v Munchel*, 991 F.3d

21   1273, jump cite 1283, a D.C. Circuit case from 2021.

22        So I am going to discuss each of the requisite

23   factors starting with the nature and circumstances of the

24   offense charged.  This factor weighs strongly in favor of

25   detention.

1      The magistrate judge in Texas agreed with this

2    conclusion stating -- from the hearing transcript, at

3    page 68:  Clearly, the facts suggest that the nature and

4    circumstances of the offense charged are very serious and

5    disturbing, and that factor certainly militates in favor of

6    detention.

7      In a nutshell, on January 6th, with both houses of

8    Congress and the Vice President of the United States meeting

9    inside the Capitol Building to carry out their

10   constitutionally-mandated duty to count Electoral College

11   votes for the next President of the United States, this

12   defendant breached the security perimeter of the Capitol

13   grounds along with many other rioters; but this defendant

14   did much more than that.

15     Mr. Ballard made his way to the very front of the

16   mob.  And it looks -- even from the videos that were

17   presented in connection with this detention hearing -- as

18   though it goes on way into the background, the size of this

19   mob -- that he was at the very front, gathered at the lower

20   west terrace, where this massive group of rioters faced off

21   against a line of police officers who were in a stationary

22   defensive position guarding an archway entrance into the

23   building.

24     This defendant then joined in with others to

25   assault the police officers on this terrace in an apparent

1    effort to break through and get inside the Capitol Building.

2    See the government's videos exhibits at 1B, 1C, 1G, 1H, and

3    1I.

4         The government's proffer in the video evidence

5    submitted by the government indicates that Mr. Ballard spent

6    at least 13 minutes, between 4:47 p.m. and 5 p.m.,

7    assaulting police officers who were guarding this entrance

8    to the Capitol Building.

9         The video evidence shows Mr. Ballard hurling a

10   tabletop and a number of small or unidentified items at law

11   enforcement; striking at the law enforcement officers with a

12   police baton; using a strobe light, apparently in an attempt

13   to disorient the police officers trying to guard the

14   entrance; breaking and throwing pieces of wood at law

15   enforcement and then throwing a long pole at law

16   enforcement.

17        This was part of a sustained assault on the lower

18   west terrace where, over the course of several hours,

19   rioters attacked members of MPD and U.S. Capitol Police who

20   were stationed there and trying to stop them from gaining

21   entrance to the Capitol.  I am sure the government is right

22   that, to them, it probably felt like an eternity for those

23   few hours standing off against this mob; and all of this

24   illegal conduct contributed to the prolonged chaos at the

25   Capitol Building, and it was part of the efforts that did

1    delay, successfully, certification of the Electoral College

2    vote for the 2020 presidential election for hours.

3         In its proffer describing the defendant's conduct

4    and the videos submitted to the Court, the government has

5    identified the defendant in at least six different videos

6    and numerous pictures taken outside the Capitol Building

7    during the riot to stop the electoral vote count on

8    January 6th.

9         The government clearly shows that the defendant

10   threatened and confronted federal officials or law

11   enforcement -- quoting *Chrestman,* at star 24 -- and that

12   defendant attempted to injure others -- which is also

13   another consideration I set out in *Chrestman* -- by

14   persistently assaulting law enforcement with multiple items,

15   including the police baton.

16        He also possessed a gas mask that he brought with

17   him to Washington, D.C., which does demonstrate some prior

18   planning -- to be prepared to engage in disruptive and

19   potentially violent behavior that would provoke a

20   response -- a nonlethal response -- by law enforcement;

21   possession of items, such as gas masks, may certainly -- are

22   not illegal in themselves and certainly could be used

23   peacefully in other contexts, but it's certainly probative

24   of preplanning of illegal or violent conduct when

25   subsequently used in the course of such violent conduct; and

1    the defendant's arguments to the contrary are utterly

2    unconvincing.

3           Based on these proffered facts, Mr. Ballard has

4    been charged with five serious felony offenses with

5    penalties ranging from 5 to 20 years' imprisonment,

6    including:  Forcibly assaulting, resisting, opposing,

7    impeding, intimidating, or interfering with any person

8    designated in Section 1114 while engaged in or on account of

9    the performance of official duties while using or carrying a

10   deadly or dangerous weapon, in violation of 18 U.S.C.

11   Section 111(a)(1) and (b)(1)(A), which offense carries up to

12   20 years' imprisonment.

13          He is also charged with committing or attempting

14   to commit any act to obstruct, impede, or interfere with any

15   law enforcement officer who lawfully engaged in the lawful

16   performance of his official duties incident to and during

17   the commission of a civil disorder which, in any way or

18   degree, obstructs, delays, or adversely affects the

19   performance of any federally protected function, in

20   violation of 18 U.S.C. Section 231(a)(3), which offense

21   carries up to 5 years' imprisonment.

22          The third felony is knowingly entering or

23   remaining in any restricted building or grounds without

24   lawful authority while using or carrying a deadly or

25   dangerous weapon, in violation of 18 U.S.C. Section

1   1752(a)(1) and (b)(1) A, which offense carries up to

2   10 years' imprisonment.

3        The next felony is knowingly, and with intent to

4   impede or disrupt the orderly conduct of government business

5   or official functions, engaging in disorderly or disruptive

6   conduct in or within such proximity to any restricted

7   building or grounds when, or so that, such conduct, in fact,

8   impedes or disrupts the orderly conduct of government

9   business and official functions, in violation of 18 U.S.C.

10  Section 1752(a)(2) and (b)(1)(A), which carries up to

11  10 years' imprisonment.

12       And his fifth felony charge is knowingly engaging

13  in any act of physical violence against any person or

14  property of any restricted building or grounds, in violation

15  of 18 U.S.C. Section 1752(a)(4) and (b)(1)(A), which carries

16  up to 10 years' imprisonment.

17       He is also charged with three misdemeanor offenses

18  stemming from the same conduct that I need not address here.

19       These serious felony charges arising out of

20  Mr. Ballard's conduct on January 6th express the

21  significance of the danger not just to our D.C. community

22  but to the country as a whole posed by the criminal steps

23  taken to stop a critical constitutional step, transfer of

24  peaceful -- otherwise peaceful -- what is supposed to be a

25  peaceful transfer of power to a new president.

1          The government's proffer and the video evidence

2    indicate that this defendant's conduct was particularly

3    violent even when measured against some other violent

4    defendants.  He appears to have planted himself at the

5    frontline of the confrontation with the police, and then

6    took to engage in this sustained assault on law enforcement

7    with whatever weapons and projectiles he could get his hands

8    on.

9          The government's proffer -- supported by extensive

10   video evidence -- of this assault on the law enforcement

11   officers, the police line guarding this particular entrance

12   to the Capitol, shows that he used -- among the weapons he

13   could find -- a police baton, a long pole, a strobe light,

14   heavy wooden boards to get law enforcement to break up their

15   defensive position.  All of this evidence about the nature

16   and circumstances of this offense weigh strongly in favor of

17   detention.

18          As to the weight of the evidence as just detailed,

19   the evidence against the defendant is pretty overwhelming,

20   strongly favors detention.  Here, too, the Texas magistrate

21   judge agreed with this conclusion stating that:  The second

22   factor is the weight of the evidence against the defendant,

23   and it's my conclusion that the weight of the evidence

24   against Mr. Ballard is strong; that factor also militates in

25   favor of detention.  See the hearing transcript at 64.

1          As I have mentioned, the government has submitted

2     multiple video clips from a variety of different angles

3     showing Mr. Ballard's actions at the Capitol, primarily at

4     the front of the crowd of rioters, hurling various objects

5     at law enforcement and attempting to strike officers with a

6     baton.  It shows him putting on his gas mask and attempting

7     to disorient law enforcement with a strobe light.  He is

8     clearly identifiable in these videos, showing his face or

9     distinctive clothing, including a tan backpack and his

10    "InfoWars" hat.

11          In fact, the defendant, in his interview with law

12    enforcement, did admit that he was the person in some of the

13    images that were taken at the Capitol, including one in

14    which he was holding a police baton.

15          In short, the weight of the evidence is very

16    strong and favors pretrial detention.

17          As to the history and characteristics of

18    Mr. Ballard, he is middle aged, 35 years old.  He has very

19    close ties to the Fort Worth area.  He has lived there for a

20    number of years and is employed both as a Domino's Pizza

21    supply chain center -- has been there for over four years --

22    and runs a motorcycle tire business.

23          He has lived at his current residence where he has

24    a live-in girlfriend, and he has for a number of years.  He

25    appears to be financially stable.  He has no significant

1    history of substance abuse.  So his community ties and his

2    employment certainly weigh in his favor and certainly

3    provides assurance that he presents no risk of flight; but

4    risk of flight is not the basis of the government's motion

5    for pretrial detention.

6         He does have some prior convictions, albeit one

7    was a prior felony according to the government and another

8    was a misdemeanor; but those are fairly old at this point

9    and were not sufficiently serious to warrant a jail term in

10   either of those prior convictions.  So I agree when

11   defendant argues that these convictions are of limited

12   probative value; I agree that this criminal history standing

13   alone does not raise concern sufficient to warrant pretrial

14   detention.

15        However, there are other details.  It does raise

16   concern on the part of the Court when they see that one

17   element of the criminal history was a conviction for evading

18   arrest; and so there are some red flags here, including

19   prior association with a militia group that, in his view, he

20   left not because of any break with whatever motivated people

21   in this militia group, but because he didn't want the

22   internal drama there; those are red flags.  But generally

23   say that -- the defendant's employment and his ties to the

24   community weigh in his favor and weigh against detention.

25        But turning to the fourth factor, the nature and

1    seriousness of the danger to the community posed by his

2    release, this also weighs heavily in favor of detention.

3    His enthusiastic participation over almost 15 minutes in

4    this violent assault at the Capitol that resulted in the

5    evacuation of the Vice President, members of Congress,

6    staff, other people legitimately inside the building when he

7    was aggressively at the front of the line fighting with

8    police officers and -- by those actions helping to encourage

9    this mob to continue in this prolonged and persistent

10   assault on law enforcement on the lower west terrace of the

11   Capitol grounds is a clear -- shows a clear disregard for

12   the safety of others, and particularly for law enforcement,

13   and shows a disregard for the rule of law.  This raises

14   grave concerns about others' safety should Mr. Ballard be

15   released.

16          The D.C. Circuit has instructed that:  Those who

17   actually assaulted police officers and broke through

18   windows, doors, and barricades, and those who aided,

19   conspired with, planned, or coordinated such actions are in

20   a different category of dangerousness than those who simply

21   cheered on the violence or entered the Capitol after others

22   cleared the way.  See *Munchel,* at page 1284.

23          This defendant is plainly in this different

24   category of dangerousness than those who merely cheered on

25   the violence.  He backed up this cheering with a baton, a

1    pole, tabletop, large pieces of wood, a strobe light -- all

2    directed to do harm to the police.  Even for this different

3    category of January 6 defendants, however, the

4    D.C. Circuit's *Munchel* decision directs that a district

5    court judge must proffer an explanation of how the defendant

6    would be capable of acting dangerously against the community

7    now that the specific circumstances of January 6th have

8    passed.

9         To reiterate, there is no presumption of mandatory

10   detention because the defendant engaged in violence against

11   law enforcement on January 6th; that violent conduct must,

12   under the Bail Reform Act, be used in an individualized

13   assessment of future dangerousness.  See the D.C. Circuit's

14   decision in *Khater*.

15        And, in fact, as I mentioned in discussions with

16   counsel, there have been a number of defendants who engaged

17   in altercations -- physical altercations -- with the police

18   on January 6th who have been released; but in those cases,

19   the altercations were momentary and sporadic, not the kind

20   of focused, prolonged, direct assault on multiple law

21   enforcement officers that is revealed in the video evidence

22   in this case.

23        In *Munchel*, for example, there was no evidence

24   that the defendants vandalized any property or physically

25   harmed any person, even though those defendants carried

1    Taser weapons -- a Taser weapon all the way into the Senate

2    Chamber; but they didn't use those weapons and, there, the

3    D.C. Circuit remanded for additional findings by the

4    district judge.

5          Here, the facts of the case made clear that the

6    defendant's dangerousness is not limited to the particular

7    circumstances of January 6 because in *Munchel*, for example,

8    the Circuit found that there was not evidence to show this

9    kind of dangerousness because there was no evidence

10   indicating the defendants in that case vandalized any

11   property or physically harmed any person, or otherwise

12   committed any violence on January 6th.

13         This defendant stands in a much different

14   position; and with this sustained disrespect and attacks on

15   law enforcement, it does indicate dangerousness that does go

16   beyond the actual events on January 6th.

17         He certainly may not have entered the Capitol

18   Building, but I do agree with another judge on this court

19   who recently rejected an argument that the defendant can't

20   be dangerous if he didn't enter the Capitol Building finding

21   this argument as nonsensical, particularly here, where

22   Mr. Ballard played such a frontline role in attempting to

23   break past the police cordoned entry into the Capitol.  The

24   fact that he remained outside was not for lack of trying.

25         So the D.C. Circuit did recently hold, in

1    reversing an order of pretrial detention, that the district

2    court:  Clearly erred in its individualized assessment of

3    the defendant's dangerousness where the record indicated

4    that the defendant had no past felony convictions, no ties

5    to any extremist organizations, and no post-January 6

6    criminal behavior that would otherwise show him to pose a

7    danger to the community within the meaning of the Bail

8    Reform Act.  See *U.S. v Tanios*, the Circuit's decision on

9    August 9, 2021.

10          As I mentioned in my conversation with Ms. Aldana,

11   the *Tanios* opinion could be read to require one of these

12   three factors, if not all three of them, to justify pretrial

13   detention; but the defendant in *Tanios* was charged as a

14   co-conspirator of a violent defendant and did not himself

15   perpetuate violence against the police even though he

16   helped -- according to the government's proffer in that

17   case -- facilitate the use of chemical spray by the

18   co-conspirator.  And, of course, the D.C. Circuit upheld the

19   detention of the co-conspirator *Khater*.

20          In this case, I am dealing with a defendant who

21   engaged in exceptionally violent behavior that is far more

22   akin to that of *Khater* than of *Tanios* and, for that matter,

23   his conduct was far different from that of the defendants in

24   *Munchel,* who engaged in no direct violence against anybody

25   including the police.

1          So for these considerations, particularly his

2     extremely sustained, prolonged, violent conduct toward law

3     enforcement on January 6th raise sufficient concerns about

4     the danger and his lack of respect for the law that

5     detention is warranted here.

6          The Texas magistrate judge concluded that

7     conditions of release imposed would sufficiently protect

8     other people in the community but, in making that finding,

9     he did not discuss the seriousness of the defendant's

10     offense conduct.  He concluded, under the first factor, that

11     the facts suggest the nature and circumstances of the

12     offense charged are very serious and disturbing, and that

13     factor certainly militates in favor of detention but did not

14     take the next -- and in this Court's view -- necessary step

15     of inferring a danger to the community from this conduct.

16          I do disagree with the magistrate judge on the

17     defendant's dangerousness and, relatedly, the defendant's

18     ability to comply with conditions of release as required to

19     protect the community because of the violence and the

20     dangerousness, and the total disregard to the law evidenced

21     by his conduct on January 6th.  And, in short, this factor

22     of dangerousness weighs heavily in favor of detention.

23          Upon consideration of the proffered evidence

24     presented and the factors set forth in 18 U.S.C. Section

25     3142(g), the Court finds that all four statutory factors --

1    or three of the four statutory factors weigh in favor of

2    pretrial detention.  The government has met its burden of

3    establishing that there are no conditions or combination of

4    conditions that will reasonably assure the safety of any

5    other person and the community, as required by Section

6    3142(e)(1).

7            The magistrate judge's pretrial release order is,

8    therefore, reversed, and the government's motion to review

9    the magistrate judge's release decision is granted; and the

10   defendant will be held without bond pending trial.

11           I will enter the transport order for Mr. Ballard

12   to be brought to this district pending trial.

13           I will direct that he appear before a magistrate

14   judge in this district on August 20, 2021, unless -- at

15   10:00 a.m., unless he is indicted before then.

16           If the defendant is indicted before then, he will

17   appear when scheduled before the judge to whom this case is

18   randomly assigned.

19           Is there anything further from the government

20   today?

21           MR. JUMAN:  No, Your Honor.  Thank you.

22           THE COURT:  Ms. Aldana, is there anything further

23   from the defense?

24           MS. ALDANA:  Yes, Your Honor.

25           Just the question of whether at that point whether

1   he will be appointed counsel or not because our office will

2   not continue to represent him after this hearing.

3            THE COURT:  Yes.  When he appears in front of the

4   magistrate judge, they will talk to him about whether

5   appointment of counsel is warranted based on his financial

6   situation.

7            MS. ALDANA:  Yes.  I just wanted -- I just wanted

8   to clarify that.  Thank you, Your Honor.

9            THE COURT:  Yes.  And Ms. Peterson is well aware

10  of Mr. Ballard since she also appeared earlier, so that

11  handoff can occur then.

12           All right.  If there is nothing further, you are

13  all excused.

14           MR. JUMAN:  Thank you, Judge.

15           (Whereupon, the proceeding concludes, 3:24 p.m.)

16                        *  *  *  *  *

17                        **I N D E X**

18

19  **WITNESS**

20

21  Jimmy Beachum                          18

22

23

24

25

## **CERTIFICATE**

I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

PLEASE NOTE:  This hearing was held via videoconference and telephonically, in compliance with the COVID-19 pandemic stay-safer-at-home recommendations, and is therefore subject to the limitations associated with the use of technology including but not limited to telephone signal interference, static, signal interruptions, and other restrictions and limitations associated with remote court reporting via telephone, speakerphone, and/or videoconferencing capabilities.

This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 20th day of September, 2021.

/s/ Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter