**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CASE NO. 21-CR-553-TFH** |
| | : | |
| **THOMAS JOHN BALLARD,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT OPPOSITION TO**
**DEFENDANT'S MOTION TO REVOKE DETENTION ORDER**

The United States of America, by and through its attorney, the United States Attorney

for the District of Columbia, respectfully submits this opposition to defendant Thomas John

Ballard's motion to revoke Chief Judge Howell's August 20, 2021, Order of Detention (ECF

No. 30).[1] In support thereof, the government states the following:

**I.    BACKGROUND**

To avoid exposition, the government refers to the general summary of the attack on the

U.S. Capitol accompanying the complaint. *See* ECF No. 1. As this Court knows, a riot cannot

occur without rioters, and each rioter's actions – from the most mundane to the most violent –

contributed to the violence and destruction of that day.

With that background, the government turns to the specific events that took place in the

tunnel leading to the Lower West Terrace ("LWT") entrance of the U.S. Capitol Building. The

entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however,

the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped,

---

[1] Ballard's motion mistakenly refers to Chief Judge Howell's detention order as "the Magistrate Judge's August 20, 2021, order of detention" (Mot. at 1) but Ballard's motion is seeking the review of Chief Judge Howell's order, not an order of a Magistrate Judge.

short tunnel that was approximately 15 feet long. That tunnel led to two sets of metal swinging doors inset with glass.  On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building. This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day. *See* Figure A.[2]



Fig. A

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby. Members of the USCP, assisted by officers from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the doorway and guarding the entrance. Many of these officers had already physically engaged with the mob for over an hour,

---

[2]  Figure A is an image from the website "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.  The archway is circled in red.

having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist. The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items. Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.  At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people.  And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me.  So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in.  That's about from the distance where I'm sitting here on the dais to that back wall.  And from that office in close proximity to where you all held the line, I listened to you struggle.  I listened to you yelling out to one another.  I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall.  And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight."  Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at   https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters like Ballard repeatedly assaulted, threatened, pushed, and beat law enforcement officers. The battle for the LWT entrance

involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the previously-mentioned assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force. Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle. *Id.* (Statement of Sgt. Aquilino Gonell)

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor. MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service. *Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 pm.

Despite being under constant assault, these officers nevertheless provided first aid to

injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area. It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance likely saved the lives of others, including potential harm to members of Congress.

*Ballard's Conduct at the United States Capitol*

Ballard came to the Capitol on January 6 and participated in the riot. Ballard was wearing a tan backpack, and a black and orange "Infowars" baseball cap. Exhibit 5 is a video showing Ballard walking on the west plaza of the Capitol, putting on his gas mask while other rioters confront the police.



*Screenshot from Exhibit 5*

At approximately 3 p.m., after the rioters broke through the police line on the West Plaza, Ballard moved from the West Plaza up to the LWT. In several videos and photos, Ballard can be seen brandishing a police baton. Exhibit 1A is a video showing Ballard holding the baton in his left hand as he reaches towards a broken window on the left side of the LWT tunnel.

5



*Screenshot from Exhibit 1A*

Ballard remained on the LWT for almost two hours, watching the rioters attack police in the tunnel with a variety of weapons, including baseball bats, stolen riot shields, poles, pepper spray, and table legs. During this period, several officers, including Officer Fanone, were dragged out of the tunnel and beaten by rioters. Though Ballard could have left at any time, he chose instead to join in the violence and attack the officers himself.

At approximately 4:47 p.m., Ballard moved to the front line of the rioters. Exhibit 1B is a video showing Ballard throwing a large wooden tabletop at the officers.



*Screenshot from Exhibit 1B*

Exhibit 1B also shows that after throwing the tabletop, Ballard threw two other objects (not

visible in the video) at the officers.

At approximately 4:50 p.m., Ballard moved closer, to the very front of the police line. From there, he used his baton to attack the officers inside the archway. Exhibit 1C shows Ballard initially striking the officers from above, with an overhand motion, and then attacking from below, in an attempt to injure the legs of the officers, under the area protected by their riot shields.



*Screenshot from Exhibit 1C*

Exhibit 1C also shows Ballard's attacks (slowed down for clarity) from the vantage point of body-worn camera footage of an officer inside the LWT tunnel.



Screenshot from Exhibit 1C

Government Exhibits 1D and 1E are screenshots from a security camera inside the LWT tunnel showing Ballard's baton attacks.



*Exhibit 1D*                    *Exhibit 1E*

Ballard continued to assault the officers inside the tunnel. Exhibit 1F is a public photo showing Ballard holding a flashlight.



*Exhibit 1F*

Exhibit 1G is a video showing Ballard shining the flashlight into the eyes of the officers inside the tunnel with intent of disorienting them and making it more difficult for them to defend themselves from the attacking rioters.



*Screenshot from Exhibit 1G*

Exhibit 1G also shows Ballard throwing a bottle of liquid at the officers in the archway.



*Screenshot from Exhibit 1G*

Next, Exhibit 1G shows Ballard grabbing hold of a long piece of scaffolding wrapped in white

canvas and shoving it at the feet of the officers.



*Screenshot from Exhibit 1G*

For context, Exhibit 4 is a screenshot from a video taken the day after the riots showing the

relative size of the canvas-wrapped scaffolding, as it was found inside the LWT tunnel.



*Exhibit 4*

Ballard's assaults on the police continued.  Exhibit 1H is a video showing that at approximately

4:59 p.m., Ballard broke a wooden plank into smaller pieces which he threw at the officers.

Exhibit 1H also shows the same conduct from the perspective of the body-worn camera of an

officer inside the LWT Tunnel.

10



*Screenshot from Exhibit 1H*

Exhibit 1I is a screenshot from a security camera inside the LWT tunnel showing that at approximately 5:00 p.m., Ballard threw a white pole at the officers.



At approximately 5:04 p.m., law enforcement began clearing rioters out of the LWT using tear gas and other non-lethal munitions. Ballard left the LWT and returned to the West Plaza below. Back on the West Plaza again, Ballard spoke on camera. Exhibit 6 is a video showing Ballard's statements from the West Plaza. Ballard identified himself with his nickname "Cliff." In response to the question of whether he had penetrated the Capitol, Ballard said "not yet" and that "they"

(referring to law enforcement) were "holding pretty hard at the door." Referring to the officers' efforts to defend against the rioters, Ballard said "they keep taking us down." Ballard added, "I took one," indicating an attack on law enforcement. After relaying information he had heard regarding the shooting of a rioter, likely referring to Ashli Babbitt, Ballard was asked about the goal of the rioters. Ballard said the goal was to get inside the Capitol. When asked what impact the riot had on the electoral college vote, Ballard said, referring to Congress, "they suspended it, because they are a bunch of cowards. We scared 'em off. Because they're scared of us." Directed to a cloud of smoke that appeared over the West Plaza, Ballard laughed and said it was possibly the contents of a fire extinguisher, and noted that the rioters were spraying fire extinguishers at law enforcement because "it covers their gas masks pretty good" and laughed again. Ballard said the "cops" should have "stood down" and let the rioters claim the Capitol, but instead they had "played" with their "toys" and "bang bangs." Referring to the non-lethal weapons law enforcement had used to clear rioters out of the LWT, Ballard said he had been hit with "solid rubber" from a "rubber grenade."[3]

Ballard was arrested in Fort Worth, Texas on August 10, 2021. Pursuant to a search warrant, Ballard's residence was searched, and law enforcement found, among other things, the tan backpack, "Infowars" baseball cap, and gas mask he wore at the Capitol.

Ballard agreed to be interviewed at the time of his arrest.  Ballard admitted he brought a gas mask with him to the Capitol on January 6 and identified himself in photographs showing him holding the baton, *see* Exhibit 3, but claimed that he found it on the ground outside the Capitol. Ballard also claimed he could not recall whether he had attacked any police officers while at the Capitol.

---

[3] Exhibit 6 was located recently by the government and was not available at the time of his initial detention hearing or his detention hearing before Chief Judge Howell.

On Ballard's phone, law enforcement found photographs Ballard took at the Capitol, including photographs of USCP signs restricting access to the Capitol grounds.  Demonstrating the motive for Ballard's violence, as well as his lack of remorse, law enforcement also found Government Exhibit 2, an image dated January 7, 2021, with the phrase "The Constitution Actually says you Can legally Overthrow your Government if they Are tyrannical."



*Procedural History*

On August 10, 2021, at the defendant's initial appearance in the Northern District of Texas, the government moved for detention pursuant to 18 U.S.C. §§ 3142. On August 13, 2021, after a full hearing, the magistrate judge denied the motion ordered Ballard released. Immediately thereafter, the government filed a motion in the District of Columbia before Chief Judge Howell for review and appeal of the N.D. Tx. release order (ECF No. 6).

On August 18, 2021, Chief Judge Howell addressed the government's motion (ECF No. 22).  Chief Judge Howell began by noting that she had reviewed, among other things, the transcript of the detention hearing held in N.D. Tx., as well as the parties written submissions and the video exhibits submitted by the government (*id*. at 3-4).

After hearing argument from the parties, Chief Judge Howell stated that based on a *de novo* review of the record, detention was appropriate.  Chief Judge Howell found that the nature and circumstances of the offense were "very serious and disturbing" and weighed in favor of detention.  Describing his conduct as a "sustained frontline attack with multiple objects over an almost 15-minute period," *id*. at 34, the Court found that Ballard's "conduct was particularly violent even when measured against some other violent defendants" (*id*. at 47).  Chief Judge Howell found that the video evidence showed Ballard:

> hurling a tabletop and a number of small or unidentified items at law enforcement; striking at the law enforcement officers with a police baton; using a strobe light, apparently in an attempt to disorient the police officers trying to guard the entrance; breaking and throwing pieces of wood at law enforcement and then throwing a long pole at law enforcement

(*id*. at 43).  Chief Judge Howell also found Ballard possessed a gas mask, which he brought with him to Washington, D.C., and which demonstrated some prior planning "to be prepared to engage in disruptive and potentially violent behavior" (*id*. at 44). She noted that Ballard had been charged with five serious felonies which expressed "the significance of the danger not just to our D.C. community but to the country as a whole" (id. at 46).

The Court also concluded that the evidence against Ballard, consisting not only of multiple videos but also his own admissions, is "pretty overwhelming" which "strongly favors" detention (*id*. at 47).

Though the Court found that Ballard's community ties weighed in his favor, the Court also noted that risk of flight was not the basis of the government's motion (*id*. at 48-49). Discussing his criminal history, Chief Judge Howell noted that Ballard's prior convictions were old and had not warranted jail terms, but expressed concerned that Ballard's criminal history included a felony conviction for evading arrest (*id*. at 49).

14

Finally, the Court found that Ballard's "enthusiastic participation over almost 15 minutes in this violent assault at the Capitol" showed "a clear disregard for the safety of others, and particularly for law enforcement, and shows a disregard for the rule of law" (*id*. at 50).

After analyzing the D.C. Circuit's cases regarding bail, including *United States v. Chrestman*, 525 F. Supp. 3d 14 (D.D.C. Feb. 26, 2021) and *United States v. Munchel*, 991 F.3d 1273 (D.C. Cir. 2021), Chief Judge Howell found Ballard was in a more serious category of dangerousness than those who simply cheered on the violence, and that his sustained attacks on law enforcement "indicate dangerousness that does go beyond the actual events on January 6th" (*id*. at 52). For all these reasons, Chief Judge Howell found, by clear and convincing evidence, that no condition or combination of conditions would reasonably assure the safety of any other person and the community (*id*. at 55). On August 20, 2021, Chief Judge Howell issued a written order of detention incorporating her comments during the hearing and specifying the bases for her ruling (ECF. No. 15).

On September 1, 2021, the grand jury issued an indictment charging Ballard with Obstruction of Law Enforcement During Civil Disorder, in violation of 18 U.S.C. § 231(a)(3), Assaulting, Resisting, or Impeding an Officer Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b), Knowingly Entering or Remaining in any Restricted Building or Ground Using a Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A), Disorderly and Disruptive Conduct in any Restricted Building or Ground Using a Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A), Engaging in Physical Violence any Restricted Building or Ground Using a Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A), and Violent Entry and Disorderly Conduct on Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D) and (G) (ECF No. 19). A superseding indictment

modifying certain charging language, but not making any substantive changes, was issued on January 26, 2022 (ECF No. 27)

### III.    **ARGUMENT**

While the Bail Reform Act allows for a district court to review the detention order issued by a Magistrate Judge, it does not provide for the review by one district judge of the detention order of another district judge. The government submits that because Ballard is asking this Court to reverse the order of another District Judge, it is properly considered a motion for reconsideration.

To prevail on a motion for reconsideration, the moving party must demonstrate either that (1) there has been an intervening change in controlling law, (2) there is new evidence, or (3) there is a need to correct clear error or prevent manifest injustice. *United States v. Ferguson,* 574 F.Supp.2d 111, 113 (D.D.C.2008); *United States v. Libby,* 429 F.Supp.2d 46, 47 (D.D.C.2006). Ballard does not meet this standard.

First, Ballard does not identify any change in controlling law since Chief Judge Howell's detention order was issued. Ballard relies heavily on *United States v. Foy*, 2021 WL 2778559 (D.C. Cir. July 2, 2021) in which Judge Chutkan ordered the pretrial release of a Capitol Riot defendant (Mot. at 8). But *Foy* pre-dates Ballard's detention hearing, and so it is not new law. Nor does *Foy* change the controlling law. To the contrary, *Foy* relied on the same cases, such as Chief Judge Howell's *Chrestman* decision and *Munchel,* which Chief Judge Howell found warranted detention in Ballard's case. And because it is distinguishable on its facts, *Foy* does not suggest any error in Chief Judge Howell's decision. Foy threw a projectile and swung a hockey stick towards law enforcement officers. *Foy*, at *1. By contrast, Ballard threw multiple items -- a tabletop, a pole, and heavy wooden boards at police. While Foy merely swung a hockey stick *towards* police,

16

Ballard actually made contact, using a police baton multiple times to strike officers. Foy was a former U.S. Marine with no criminal history; Ballard has no military service, and he has a criminal history, including a felony conviction for evading arrest, which Chief Judge Howell found concerning. There was no evidence that Foy engaged in any planning; Ballard brought a gas mask and likely a police baton, demonstrating that he planned for violence and/or to provoke a response from law enforcement. In sum, the fact that a different judge released a different defendant has no bearing on the analysis for Ballard's detention.

Similarly, Ballard's chart of Capitol Riot defendants who have been granted pretrial release when charged with assault of a federal officer under 18 U.S.C. § 111 (ECF No. 30-3) does not assist the analysis. First, the chart overlooks the distinction between assault of a federal officer under 18 U.S.C. § 111(a), which is a misdemeanor, and assaults with a dangerous or deadly weapon, which is a felony pursuant to 18 U.S.C. § 111(b). Most of the cases listed on Ballard's chart are thus irrelevant because they do not involve the same charges. Even if they involve assault with a deadly or dangerous weapon, they do not involve repeated attacks with multiple weapons as in Ballard's case. Second, the chart does not come close to providing the kind of detail necessary for a fair comparison. The detention decision is necessarily an individualized determination, based on a variety of factors. Ballard's chart does not indicate, for example, whether these individuals had any criminal history. Nor does it reflect whether, unlike Ballard, these defendants voluntarily surrendered and were candid with law enforcement about their conduct. It does not show whether the defendants brought weapons and tactical gear to the Capitol, like Ballard. And it does not reflect whether these defendants acted spontaneously, or whether, like Ballard, they watched the violence for almost two hours before deciding to join in. Accordingly, nothing in Ballard's chart suggests that Chief Judge Howell's determination in *this* case was erroneous.

Second, Ballard does not identify any new evidence warranting reconsideration of Chief Judge Howell's detention order. To the contrary, Ballard simply reiterates the arguments he made to Chief Judge Howell, with virtually no recognition that Chief Judge Howell heard these arguments, considered them, and sill found detention was warranted.

Third, Ballard has not shown any clear error or manifest injustice in Chief Judge Howell's order. Chief Judge Howell scrupulously reviewed the factors under 18 U.S.C. § 3142(g) and applicable D.C. Circuit law, and found that detention was appropriate. While Ballard's motion avoids any detailed discussion of his conduct on January 6, Chief Judge Howell examined that conduct closely and properly found that Ballard's actions – repeatedly assaulting riot-clad police officers with dangerous weapons as part of a violent mob, in order to prevent Congress from certifying the 2020 election -- demonstrate his lack of regard for laws and authority and the risk of danger he poses to the community. His decision to bring a police baton and gas mask to the riots demonstrates that Ballard planned for violence. The fact that Ballard watched the violence for almost two hours before acting demonstrates that he was not caught up in the moment; his decision to engage in violence was deliberate. The image on Defendant's cellphone shows Defendant's motivation on January 6 was "overthrow" of the government and his lack of remorse. The fact that he has evaded arrest in the past and unlawfully possessed a firearm are further evidence of the danger he poses and his lack of regard for laws and authority. And Defendant's lies to law enforcement during his post-arrest statement, claiming that he "found" a police baton on the ground and that he could not recall whether or not he had assaulted law enforcement during the riots increase the likelihood that he will not obey any conditions of release that the Court might set.

Ballard's on-scene interview, which was not available to Chief Judge Howell, is also

important. Ballard admitted that his goal was to get inside the Capitol building, and admitted to having attacked law enforcement, which makes the evidence against him stronger. Rather than showing remorse, he claimed his violent attacks were justified, and his response of "not yet" shows that even after being tear gassed and hit with non-lethal munitions, he was still ready and willing to fight law enforcement to get inside the Capitol. The pride he displayed when bragging that Congress had suspended the electoral college vote because they were "scared" of him and other rioters demonstrates his belief that violence is a legitimate way to pursue political goals. And his obvious pride at having attacked police, and his laughter at the thought of rioters spraying police with fire extinguishers shows a callousness and lack of remorse which further supports Chief Judge Howell's finding of dangerousness.

Finally, Ballard has not shown that his release is "necessary" for the preparation of his defense. *See* 18 U.S.C. § 3142(i). In his motion, and during the March 28, 2022, status conference, Ballard claimed that he was unable to view video evidence at his facility, USP Lewisburg. In response to Ballard's allegations, the government contacted Jennifer Knepper, BOP Supervisory Attorney, regarding Ballard's ability to review discovery at USP Lewisburg. Ms. Knepper, who will be available to answer the Court's questions at the April 11, 2022 hearing, has confirmed that Ballard's complaints are without merit, and that he has failed to pursue the resources available to him at USP Lewisburg.

Ballard represents that he has had difficulty viewing the video evidence against him based on a lack of privacy and a lack of working computers at his facility. Ballard also claims that lockdowns at his facility have prevented him from viewing the evidence. These claims are false.

Attached as Exhibit 7 is a copy of USP Lewisburg's legal procedures. According to Ms. Knepper, a copy of these procedures was emailed to Ballard's counsel on January 10, 2022.  With

respect to his attorney's ability to review discovery with him during a legal visit, under the section entitled "Guidelines for In-person Legal Visiting," Exhibit 7 states that although personal laptops and cellphones are not permitted in the facility, ***"[i]nstitutional laptops will be furnished to review electronic discovery during your visit."*** *See* Ex. 7, at 2 (emphasis added). Ms. Knepper advised Ballard's counsel on January 10, 2022, that although advanced notice is helpful, Ballard's counsel does not need to make an appointment for an in-person visit. This means Ballard's attorney is free to visit at any time and review discovery on a laptop which the facility would provide.

Second, with respect to Ballard's ability to privately review the electronic discovery,[4] under the section entitled "Electronic Discovery Materials," the document states:

> Inmates can review their electronic discovery on a computer in their housing unit. ***Additionally, inmates with sensitive cases or those desiring additional privacy will have the opportunity to request the use of a secure discovery computer through the housing unit staff.***

(*id*. at 3) (emphasis added). In other words, if Ballard does not want to view his discovery on the computers available in his unit, he is able to request the use of a private room with a computer. According to Ms. Knepper, Ballard has never made such a request.

With respect to Ballard's claim that lockdowns at his facility have interfered with his ability to review discovery, Ms. Knepper advises that the last lockdown was lifted on February 20, 2022 and there were no lockdowns at USP Lewisburg during the month of March 2022.

In sum, Ballard's assertions regarding conditions at USP Lewisburg are inaccurate, and has had ample opportunities to review electronic discovery.   Accordingly, he has not shown that release is "necessary" for him to prepare for trial.

## IV.    **CONCLUSION**

---

[4] Ms. Knepper also confirms that there are four working discovery computers in Ballard's unit, one of which was recently repaired.

For the foregoing reasons, the government respectfully requests that Ballard's motion to revoke Chief Judge Howell's August 20, 2021, detention order be denied.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:      /s/ *Robert Juman*                          
Robert Juman
Assistant United States Attorney
Bar No. NJ 033201993
United States Attorney's Office, Detailee
555 Fourth Street, N.W.
Washington, DC 20530
Phone: (786) 514-9990
E-mail: Robert.juman@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the Government's Opposition To Defendant's Motion To Revoke

Detention Order was served on all counsel of record via the Court's electronic filing service.


_/s/ Robert Juman_____
ROBERT JUMAN
Assistant United States Attorney


Date:  April 4, 2022