**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL NUMBER 21-553-TFH-1** |
| | **:** | |
| | **:** | |
| **THOMAS BALLARD** | **:** | |

<u>**ORDER**</u>

    **AND NOW**, this      day of       , 2022, having considered

Defendant's Motion for Transfer and the government's Response thereto, it is hereby

**ORDERED** that Mr. Ballard' Motion is **GRANTED**.  The trial is hereby **TRANSFERRED** to

the Northern District of Texas.

                       **BY THE COURT:**

                       _____

                       **THE HONORABLE THOMAS F. HOGAN**
                       **United States District Court Judge**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | CRIMINAL NUMBER 21-553-TFH-1 |
| | : | |
| | : | |
| THOMAS BALLARD | : | |

## <u>MOTION FOR TRANSFER</u>

Thomas Ballard, by and through counsel, moves this Court for a transfer of venue for trial on the basis of prejudice. Mr. Ballard asks for a change of venue pursuant to his right to trial by an impartial jury under the Fifth and Sixth Amendments, and pursuant to his right to a fair and impartial trial under Rule 21(a) of the Federal Rules of Criminal Procedure.

Defendant hereby incorporates the corresponding Memorandum in Support of Thomas Ballard's Motion for Transfer in support of this motion.

Respectfully submitted,

*/s/ Andrew Moon*
ANDREW MOON
Assistant Federal Defender

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | CRIMINAL NUMBER 21-553-TFH-1 |
| | : | |
| | : | |
| THOMAS BALLARD | : | |

**MEMORANDUM IN SUPPORT OF THOMAS BALLARD'S**
**<u>MOTION FOR TRANSFER</u>**

Defendant Thomas Ballard, by and through counsel, pursuant to Rule 21(a) of the Federal

Rules of Criminal Procedure, requests a change of venue due to significant prejudice in the District

of Columbia prohibitive of a fair and impartial trial, invoking his right to a fair trial by an impartial

jury under the Fifth and Sixth Amendments.

Mr. Ballard asserts that community prejudice in Washington D.C. is so likely to have

affected the jury pool that the venire must be presumed as tainted. Defendant proposes that this

matter be moved to the Northern District of Texas, where he resides, where he was arrested, and

where potential witnesses reside.

**I.      BACKGROUND**

Thomas Ballard was arrested in Texas on August 10, 2021, after an arrest warrant was

issued in Washington, D.C., for his conduct at the Capitol on January 6, 2021. According to

security footage from the Capitol, Mr. Ballard can be seen throwing a table, throwing planks of

wood, and hitting officers with a baton.

The evidence in this case is centered around the January 6 Capitol incident, the 2020

Presidential election, discussions of politics, and the defendants' support for Donald Trump. Most

of the Government's evidence against Mr. Ballard involves his discussion of politics. This case is factually political, through and through.

### a. Political Prejudice and Pretrial Publicity

The facts of this case center around Donald Trump and his supporters. The evidence in this case is emotionally political in every respect and the potential jury who would hear the facts in Washington D.C. is the most politically prejudiced jury in the country.

The District Court for the District of Columbia draws its jury pool solely from the District of Columbia. In the 2020 Presidential Election, 94.6% of District of Columbia voters voted against Donald Trump.[1] In the 2016 Presidential Election, 95.9% of District of Columbia voters voted against Donald Trump.[2] The Democratic candidate received more than 90% of the vote in both elections. This astounding lack of political diversity is unique to the jury pool for the District of Columbia. Moreover, this lack of political diversity in the venire comes at a time when politics have divided Americans at exceptional levels.[3]

The D.C. jury pool, already politically averse to Donald Trump supporters, has been barraged with political propaganda from U.S. politicians and coverage of the same by the media following the January 6 incident. According to a Pew Research Center poll, Democrats were significantly more likely to hear about the Capitol incident than Republicans.[4]

---

[1] 2020 Election Results, DCBOE, https://electionresults.dcboe.org/election_results/2020-General-Election (last visited May 27, 2022).
[2] 2016 Election Results, DCBOE, https://electionresults.dcboe.org/election_results/2016-General-Election (last visited May 27, 2022).
[3] America is exceptional in the nature of its political divide, Pew Research Center (2021), https://www.pewresearch.org/fact-tank/2020/11/13/america-is-exceptional-in-the-nature-of-its-political-divide/ (last visited May 27, 2022).
[4] Views on the U.S. Capitol riot, Pew Research Center (2021), https://www.pewresearch.org/politics/2021/01/15/views-on-the-rioting-at-the-u-s-capitol/ (last visited May 27, 2022).

On January 26, 2021, while speaking in Washington D.C., President Biden referred to Trump supporters involved in the January 6 incident as "a group of thugs, insurrectionists, political extremists, and white supremacists."[5] While on the House floor in Washington, D.C., Rep. Cori Bush called the January 6 incident "a white supremacist insurrection" and a "domestic terror attack."[6] Rep. Ayanna Pressley referred to the people involved in the incident as "the white supremacist mob."[7] Indeed, within the first week of the incident, 73% of Democrat leaders in Washington referred to the January 6 event as an "insurrection."[8] Democrat lawmakers' social media engagement skyrocketed after January 6th as they began heavily discussing the incident.[9] By February, it became second nature for Democrats to describe the incident as an "insurrection" and to refer to Trump supporters as "white supremacists." While sworn before the Senate Judiciary Committee on February 22, 2021, Merrick Garland described the January 6 incident as "a heinous attack that sought to disrupt a cornerstone of our democracy" and described the individuals involved as "white supremacists and others who stormed the Capitol."[10]

---

[5] Remarks by President Biden at Signing of an Executive Order on Racial Equity, The White House (2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/01/26/remarks-by-president-biden-at-signing-of-an-executive-order-on-racial-equity/ (last visited May 27, 2022).

[6] Rep. Cori Bush Calls Trump 'White Supremacist-in-Chief', NBC4 Washington (2021), https://www.nbcwashington.com/news/national-international/rep-cori-bush-calls-trump-white-supremacist-in-chief/2540892/ (last visited May 27, 2022).

[7] Rep. Pressley: Husband positive for COVID-19 after lockdown, WTOP (2021), https://wtop.com/national/2021/01/rep-pressley-husband-positive-for-covid-19-after-lockdown/ (last visited May 27, 2022).

[8] Lawmakers of each party used distinct language on social media in days following Jan. 6 rioting at U.S. Capitol, Pew Research Center (2021), https://www.pewresearch.org/fact-tank/2021/01/15/how-lawmakers-social-mediaactivity-changed-in-the-days-after-the-u-s-capitol-riot/ft_2021-01-15_socialmediacongress_01/ (last visited May 27, 2022).

[9] Audience engagement with posts from Democratic lawmakers increased after Jan. 6 rioting at U.S. Capitol, Pew Research Center (2021), https://www.pewresearch.org/fact-tank/2021/01/15/how-lawmakers-social-media-activitychanged-in-the-days-after-the-u-s-capitol-riot/ft_2021-01-15_socialmediacongress_02/ (last visited May 27, 2022).

[10] Hearing before the U.S. Senate Committee on the Judiciary, Merrick Brian Garland Nominee for Attorney General, February 22, 2021 (2021), https://www.judiciary.senate.gov/imo/media/doc/SJC%20Testimony.final.pdf (last visited May 27, 2022).

Local Washington D.C. news amplified the politics of D.C., filling local news with coverage of these statements and discussion of the implications from the "white supremacists" and the "insurrection," and even discussions of a "race war."[11] Former President Trump has been referred to as the "leader" of these "white supremacists" and was placed on trial for "inciting an insurrection."[12] Nancy Pelosi went so far as to declare that Donald Trump is an accessory to murder.[13]

The response in modern culture to "white supremacists" has been uniform: termination from employment, public shaming, and "getting canceled," a colloquial term denoting social pariah status. There is a social expectation of punishment for anyone accused of being a "white supremacist." In Washington D.C., people have been readily "canceled" for being politically conservative and for their public support of Donald Trump.[14] For example, Cleta Mitchell resigned from his D.C. law firm, Foley & Lardner, after "a massive pressure campaign in the last several days mounted by leftist groups against me, my law firm and clients," due to

---

[11] Analysis: A race war evident long before the Capitol siege, WTOP (2021), https://wtop.com/national/2021/02/analysis-a-race-war-evident-long-before-the-capitol-siege-2/ (last visited May 27, 2022); Dozens Charged in Capitol Riots Spewed Extremist Rhetoric, NBC4 Washington (2021), https://www.nbcwashington.com/news/nationalinternational/dozens-charged-in-capitol-riots-spewed-extremist-rhetoric/2575102/ (last visited May 27, 2022); Trump Legacy on Race Shadowed by Divisive Rhetoric, Actions, NBC4 Washington (2021), https://www.nbcwashington.com/news/politics/trump-legacy-on-race-shadowed-by-divisive-rhetoric-actions/2536591/ (last visited May 27, 2022).
[12] Insurrection? Sedition? Unpacking the Legal Issues From the Capitol Riot, The Washington Post (2021), https://www.washingtonpost.com/business/insurrection-seditionunpacking-the-legal-issues-from-the-capitol-riot/2021/01/14/4fe1f618-5631-11eb-acc5-92d2819a1ccb_story.html (last visited May 27, 2022).
[13] Nancy Pelosi on the Capitol Hill insurrection: Trump was an accessory to the crime of murder, MSNBC.com (2021), https://www.msnbc.com/msnbc/watch/nancy-pelosi-on-the-capitol-hill-insurrection-trump-was-anaccessory-to-the-crime-of-murder-99705925960 (last visited May 27, 2022).
[14] See e.g., Martin Austermuhle, D.C. Charter School Board Investigating Senior Employee For Alleged Alt-Right Links, WAMU (Jan. 24, 2018), https://wamu.org/story/18/01/24/d-c-charter-school-board-investigating-senior-employee-alleged-alt-right-links/.

Ms. Mitchell's association with President Trump.[15] Many individuals who attended the Trump rally at the Capitol on January 6, regardless of entry into the Capitol, have been "canceled" and fired just due to their association with the incident.[16]

The D.C. venire is polluted by the city's political culture of "canceling" those associated with allegations of "white supremacy." A guilty verdict by a D.C. jury could be readily based on pretrial media affiliation of the D.C. protestors with "white supremacy." The media has irreversibly tarnished any possible objectivity of a D.C. jury fairly reviewing Mr. Ballard's case through the interjection of political propaganda of "racism" into Mr. Ballard's case. The media's characterization of the incident compels a socially responsive Washington D.C. jury to enter a guilty verdict regardless of the applicability of such a verdict to the facts of the case.

The prejudiced politics render the District of Columbia a hostile jurisdiction for the trial of Mr. Ballard. When considered in combination with the community prejudice of Washington D.C. to the Capitol incident, the venire is rendered so greatly tainted that a presumption of prejudice must be applied, and a change in venue is necessary to cure the prejudice.

**b. Community Prejudice Through the Militarization of Washington D.C.**

The unprecedented closure of Washington D.C. and the military takeover of the city by the National Guard materialized into an incurable community prejudice against the Capitol incident defendants. The National Guard militarized Washington D.C. with an estimated 26,000

---

[15] Megan Sheets, *DC lawyer secretly advising Trump quits after leaked Georgia call*, Mail Online (Jan. 5, 2021, 9:51 PM), https://www.dailymail.co.uk/news/article-9116783/Top-DC-lawyer-secretly-advising-Trump-quits-firm-leaked-Georgiacall.html.

[16] Mike Stone and Diane Bartz, *Some U.S. Capitol rioters fired after internet detectives identify them*, Reuters (Jan. 7, 2021, 6:12 PM), https://www.reuters.com/article/us-usa-election-protests-fallout/some-u-s-capitol-rioters-fired-after-internet-detectivesidentify-them-idUSKBN29C36M; Brad Heath, *U.S. suspends federal agent who joined crowd outside Capitol during rampage, lawyer says*, Reuters (Mar. 3, 2021, 5:49 PM), https://www.reuters.com/article/amp/idUSKCN2AV2XC.

troops in response to the January 6 incident.[17] As if that was not enough, police officers from across the country were sent to Washington D.C. to assist the National Guard.[18] As a result of the Capitol incident, the Mayor of D.C. declared a public emergency[19] to last for 15 days and issued a 6 p.m. curfew for the first few days of the emergency.[20] D.C. was militarized and locked down.[21] Four bridges connecting Virginia to D.C. were closed for three days, preventing local DMV travel.[22]

On January 27, 2021, President Biden's Secretary of Homeland Security issued a National Terrorism Advisory System Bulletin. The American people were warned that "ideologically-motivated violent extremists with objections to the exercise of governmental authority and the presidential transition, as well as other perceived grievances fueled by false

---

[17] Howard Altman, *26,000 National Guard troops came to DC and protected the inauguration without incident*, Military Times (Jan. 21, 2021), https://www.militarytimes.com/news/your-military/2021/01/21/26000-national-guard-troops-came-to-dc-to-protect-the-inauguration-now-the-drawdown-begins/.

[18] Katherine Rosenberg-Douglas, *34 Chicago police officers to help keep Washington safe on unprecedented Inauguration Day*, Chicago Tribune (Jan. 19, 2021, 8:03 PM), https://www.chicagotribune.com/news/breaking/ct-chicago-police-in-washington-biden-inauguration-20210120-n3tketsrb5d2jk7rsgaemvicjm-story.html; *Hundreds of local officers sent to Washington D.C. to help with inauguration security*, Wbtv.com, https://www.wbtv.com/2021/01/18/hundreds-local-officers-sent-washington-dc-help-with-inauguration-security/ (last updated Jan. 18, 2021, 5:00 PM); Phil Prazan and Willard Shepard, *South Florida Police Officers Join Effort to Secure D.C. Ahead of Inauguration Day*, NBC 6 South Florida (Jan. 17, 2021), https://www.nbcmiami.com/news/local/south-florida-police-officers-join-effort-to-secure-d-c-ahead-ofinauguration-day/2364747/.

[19] *Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days*, Mayor.dc.gov (Jan. 6, 2021), https://mayor.dc.gov/release/mayor-bowser-issues-mayor's-order-extending-today's-public-emergency-15-days-a1.

[20] *Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today*, Mayor.dc.gov (Jan. 6, 2021), https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pm-today.

[21] *Downtown DC Locked Down to Secure Inauguration Ceremonies*, NBC4 Washington (Jan. 20, 2021, 11:27 AM), https://www.nbcwashington.com/news/local/downtown-dc-locked-down-to-secure-inauguration-ceremonies/2546778/.

[22] Matt Blitz, *Four Bridges Connecting Va. to D.C. Will Be Closed Starting Tuesday*, ARLnow.com (Jan. 15, 2021, 5:45 PM), https://www.arlnow.com/2021/01/15/four-bridges-connecting-va-to-d-c-will-be-closed-starting-tuesday/.

narratives, could continue to mobilize to incite or commit violence."[23] This appears to have been a direct reference to Trump supporters and the Capitol incident.

D.C. was warned that "Domestic Violent Extremists" were a threat to the political facilities in Washington D.C and the city continued to see militarized presence during this time.[24] In February, 7,000 National Guard troops remained in Washington D.C.[25] The National Guard kept the city under siege with 5,000 troops in March.[26] 3rd Street was sealed off to traffic for two months, affecting commuting and travel.[27]

The unprecedented militarization and closure of our nation's capital and the seemingly endless occupation of D.C. by the National Guard, further aggravated by D.C. politicians referring to Capitol defendants as "white supremacists" and "insurrectionists," has prejudiced the prospective jurors to such a degree that a fair trial in Washington D.C. is simply unattainable.

## II.   LEGAL STANDARD

The Firth Amendment and the Sixth Amendment entitle criminal defendants to a fair trial by an impartial jury. "The great value of the trial by jury certainly consists in its fairness and impartiality." *United States v. Burr*, 25 F. Cas. 49, 51 (CC Va. 1807). An impartial jury is required under the Constitution and has been required since the times of common law. *Id; see*

---

[23] *National Terrorism Advisory System Bulletin*, Department of Homeland Security (Jan. 27, 2021, 11:00 AM) https://www.dhs.gov/sites/default/files/ntas/alerts/21_0127_ntas-bulletin.pdf.

[24] Courtney Pomeroy, *Domestic 'heightened threat environment' prompts Homeland Security terrorism bulletin*, WJLA (Jan. 27, 2021), https://wjla.com/news/nation-world/homeland-security-issues-terrorism-bulletin-for-domestic-heightened-threat-environment.

[25] Nick Boykin, *5,000 National Guard troops will stay in DC through mid-March, officials say*, WUSA-TV (Jan. 23, 2021, 8:10 PM), https://www.wusa9.com/article/news/local/dc/national-guard-us-capitol-how-long-will-they-be-there/65-156fa765-acf9-4f67-b87e-d1b5b38a9904.

[26] *Id.*

[27] Mike Valerio, *Barbed wire fence at the Capitol is coming down. But its razor wire will move closer to Congress.*, WUSA9 (March 1, 2021, 6:12 PM), https://www.wusa9.com/article/news/national/capitol-riots/capitol-fencing-comes-down-othis-barriers-stillup/65-b346d31a-40fe-4775-9acf-af9b46d1ba6f.

*also Patton v. Yount*, 467 U.S. 1025 (1984). "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). Federal Rule of Criminal Procedure 21(a) instructs that district courts "must transfer the proceeding … if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

While the Sixth Amendment provides a right to trial by "jury of the State and district wherein the crime shall have been committed," the Constitution's place-of-trial prescriptions do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial. *Skilling v. United States*, 561 U.S. 358, 130 S.Ct. 2896 (2010); *see also Sheppard v. Maxwell,* 384 U.S. 333, 362 (1966) ("Due process requires that the accused receive a trial by an impartial jury free from outside influences."). The Supreme Court has overturned convictions where the district court failed to transfer for venue after prejudicial pretrial publicity. *See, e.g.*, *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Estes v. State of Texas*, 381 U.S. 532 (1965); *Sheppard v. Maxwell,* 384 U.S. 333 (1966). The Supreme Court has also reversed convictions where there was a "huge . . . wave of public passion" and where the venire possessed "a belief in [defendant's] guilt." *Irvin v. Dowd*, 366 U.S. 717, 728 (1961) (vacating a conviction and death sentence for the trial court's failure to transfer venue for community publicity); see also *Patton v. Yount*, 467 U.S. 1025 (1984).

Later, in *Nebraska Press Assn. v. Stuart*, 427 U.S. 539 (1976), and then again in *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court clarified that "pretrial publicity—even pervasive, adverse publicity— does not inevitably lead to an unfair trial." *Nebraska Press Assn. v. Stuart*, 427 U.S. at 554. Instead, a combination of factors needed to be considered in determining the appropriateness of change of venue. *See Skilling v. United States*, 561 U.S. 358 (2010). In

*Skilling*, the Supreme Court explained that cases previously reversed on appeal for failure to change venue had trials that were tainted by an atmosphere "utterly corrupted by press coverage." 561 U.S. at 380. *Skilling* explained that the court must have proof of "vivid, unforgettable information … particularly likely to produce prejudice" in determining that a fair trial is untenable. *Id*.

Over the past few decades, we have seen federal courts interpret the Supreme Court's venue case law as requiring a show of community effect, in addition to a show of pretrial publicity. For example, in *United States v. McVeigh*, an Oklahoma district court ruled that the "emotional burden of the explosion and its consequences" and the community prejudice against the defendants accused of the bombing in Oklahoma City was so great that they could not obtain a fair and impartial trial in the state of Oklahoma. *United States v. McVeigh*, 918 F.Supp. 1467 (W.D.Okla. 1996). A decade later, in *United States v. Awadallah*, a New York district court stressed that "the effects that a massive, disastrous event has wrought on the jury pool as a whole" are more relevant to a change of venue request than pretrial media publicly. *United States v. Awadallah*, 457 F. Supp. 2d 246 (S.D.N.Y. 2006).

After *Skilling*, district courts began analyzing the four factors that the Supreme Court evaluated in determining whether a change of venue is warranted: (i) the size and characteristics of the community; (ii) the nature and extent of the pretrial publicity; (iii) the proximity between publicity and the trial; and (iv) evidence of juror partiality. *Skilling,* 130 S.Ct. at 2915-2917. The *Skilling* standard and analysis applies to the matter at hand.[28]

---

[28] Prior to *Skilling,* the District Court for the District of Columbia employed its own standard for transfer of venue, an "extreme circumstances" standard. *See United States v. Edmond,* 52 F.3d 1080, 1099 (D.C. Cir. 1995). *Skilling* now directs us to analyze four components in examining the presumption of prejudice, instead of the "extreme circumstances" standard.

### III.    ARGUMENT

A trial in Washington D.C. for Mr. Ballard would be by jurors who voted almost unanimously against Donald Trump, who have been barraged with propaganda about a "white nationalist" attack and are continuously told they were victims of an "insurrection," who were placed under curfew and locked down as a result of danger posed by "Domestic Violent Extremists." The unavoidable community prejudice and pretrial publicity render the venire so greatly prejudiced against him that Mr. Ballard cannot obtain a fair and impartial trial in Washington D.C.

**a.   Review of the *Skilling* factors weighs Mr. Ballard's case in favor of transfer.**

i.    *Skilling* Factor 1: The Size and Characteristics of the Community

Washington D.C. is a relatively small community, with a population of about 700,000, and an estimated potential jury pool of less than 500,000. About 33% of employed Washington D.C. residents work for the government, considerably reducing the eligible jury pool for a case where government employment will likely cause a bias.[29] Moreover, approximately 95% of the voters in D.C. voted against Donald Trump, rendering Washington D.C. as having the least diverse political population as compared to each of the 50 states.[30] Washington D.C. provides a small, uniform pool of people when compared to Houston in the *Skilling* case, which had a "large, diverse pool" of 4.5 million eligible jurors. *Skilling*, 561 U.S. at 382. Indeed, Washington D.C. is more like the community in *Rideau*, a small town of 150,000 residents; or even Puerto Rico, which has "a compact, insular community" of approximately 3 million people. *Skilling*, 130 S.Ct. at 2915;

---

[29] District of Columbia, Urban Institute, https://www.urban.org/policy-centers/cross-center-initiatives/stateand-local-finance-initiative/projects/state-fiscal-briefs/washington-dc (last visited May 27, 2022).

[30] Election results: The 2020 presidential race, Politico.com (2021), https://www.politico.com/2020-election/results/president/ (last visited May 27, 2022).

*United States v. Casellas-Toro*, 807 F.3d 380, 385 (1st Cir. 2015); *see also Mu'Min v. Virginia*, 500 U.S. 415 (1991) (potential for prejudice mitigated by the size of the Eastern District of Virginia, "which has a population of over 3 million"); *but see Gentile v. State Bar of Nev.,* 501 U.S. 1030 (1991) (reduced likelihood of prejudice where venire was drawn from a pool of over 600,000 individuals).

    *ii.*  *Skilling* Factor 2: The Nature and Extent of the Pretrial Publicity

    The pretrial notoriety of the Capitol incident is more complicated, hyped, and widespread than any other criminal matter in Washington D.C.'s history. Aside from media publicity, there is extensive political publicity for the Capitol cases. It appears that every local D.C. politician, and every national politician working in D.C., has chimed in on this case. No positive statements were made from either side of the political aisle. On the contrary, more fuel was added to the fire as Democratic politicians, the party that mirrors the beliefs of 95% of the D.C. jury pool, started referring to the individuals involved in the Capitol incident as "white supremacists" and "insurrectionists" – during a time of exceptional political divide in the United States. President Biden made a speech on racial tensions in the U.S. in which he referred to the Capitol arrestees as "a group of thugs, insurrectionists, political extremists, and white supremacists." The Biden administration warned that these people were "ideologically-motivated violent extremists with objections to the exercise of governmental authority and the presidential transition, as well as other perceived grievances fueled by false narratives." (Notably, not even one of the more than 600 arrested Capitol defendants have been charged with terrorism, hate crimes, or insurrection, contrary to what the Biden administration warnings would imply.)

    Biden's administration also warned that others like these arrestees "could continue to mobilize to incite or commit violence," and Nancy Pelosi continued to keep National Guard in

Washington D.C. to continue manifesting a physical reminder of the perceived danger.[31] At least 26,000 National Guard troops took over Washington, D.C. The streets were empty; Washington D.C. was an occupied zone throughout the month of January. This was an unprecedented show of force in response to the Capitol incident that impacted the entire D.C. community. D.C. residents were impacted emotionally, visually, and physically by the military restrictions. Washington D.C. resident Andrew Kovacs told NPR, "It feels like Gotham City from the Batman movies where we are kind of on our own, locked in the city here. You know, with the bridges closing out of Virginia, it feels like it's just us, and the whole world is watching."[32] Brandon Stryder explained the practical struggles of living inside of a military enclosure, saying, "There's a checkpoint actually set up right by our building. A few nights ago, we were trying to pull our car out to go get groceries and they put a cinder block, blocking the alleyway so we couldn't even exit the parking garage."[33] D.C. resident Yolanda Inchauregui told NPR, "I feel like I'm in a war."[34] Moreover, D.C. residents feel that they are being punished for the wrongdoing of the "mob attack on the Capitol," with one D.C. resident expressing that "a fence punishes the wrong people."[35]

The fallout from January 6th, 2021 continues to this day. Security fences returned to the Capitol in September as law enforcement prepared for a protest of the ongoing criminal cases tied to the January 6 incident.[36] This Court noted during the September 16, 2021 hearing on Mr.

---

[31] Roman Chiarello, *House Republicans demand explanation from Pelosi on extended deployment of National Guard in D.C.*, Fox News (Feb 15, 2021), https://www.foxnews.com/us/national-guard-troops-dc-fall-pelosi-mcclain.

[32] *What It's Like To Live Inside D.C.'s Militarized Security Zone*, NPR (Jan. 19, 2021), https://www.npr.org/local/305/2021/01/19/958311657/what-it-s-like-to-live-inside-d-c-s-militarized-security-zone.

[33] *Id.*

[34] *Id.*

[35] *Residents Resistant To Permanent Capitol Security Fence*, NPR (Feb. 13, 2021), https://www.npr.org/2021/02/13/967704469/residents-resistant-to-permanent-capitol-security-fence.

[36] Claudia Grisales, *Capitol Police Are Upping Security Ahead Of A Rally In Support Of The Jan. 6 Rioters*, NPR (September 13, 2021, 5:41 PM), https://www.npr.org/2021/09/13/1036700856/the-u-s-capitol-police-will-reinstall-fencing-ahead-of-a-far-right-rally.

Ballard's motion to revoke detention that "[t]he threat is not over. The fences are literally going up around the Capitol as we sit here today." Tr. 46:23–24.

D.C. residents, who were already predisposed to political bias against the Capitol defendants, had their bias cemented by the burden of enduring a militant response to the January 6 incident that continues to this day. Furthermore, the tensions in the city are suggestive of the residents' predisposition to "punish" Capitol incident defendants. The closure of the nation's capital by the National Guard was not just a physical manifestation of the city's greatest fears and insecurities, it also serves as a daily reminder to D.C. residents that they are continuing to pay for the Capitol incident with loss of their city and travel freedoms.

As discussed *supra*, the Washington D.C. venire is almost entirely liberal. According to a 2019 study, social liberals taught about "white privilege" had decreased sympathy for white people as a result, and "these shifts in sympathy were associated with greater punishment/ blame."[37] A modern-day liberal D.C. jury that is readily swayed by the socio-political concept of "social justice" will be prejudiced against rendering a not guilty verdict for a defendant who actively supported a President that has been politically deemed "racist."[38] Democrats believe that "in a racist society, it is not enough to be non-racist, we must be antiracist."[39] How would being actively "anti-racist" translate on a D.C. jury overseeing the case of a Capitol "insurrectionist"

---

[37] Erin Cooley et al., *Complex intersections of race and class: Among social liberals, learning about White privilege reduces sympathy, increases blame, and decreases external attributions for White people struggling with poverty.*, 148 Journal of Experimental Psychology: General 2218-2228, https://psycnet.apa.org/record/2019-22926-001 (2019).

[38] Jennifer Rubin, *Trump's language is racist. Period*, The Washington Post (June 23, 202), https://www.washingtonpost.com/opinions/2020/06/23/follow-general-sanchezs-lead-trumps-language-is-racist/.

[39] Kendi, Ibram. *How to Be an Antiracist*. Bodley Head, 2019; Richard Zitrin, Why being anti-racist is not enough, ABA Journal (2021), https://www.abajournal.com/voice/article/being-anti-racist-is-not-enough (last visited Feb 17, 2021); 'Not Racist' Is Not Enough: Putting In The Work To Be Anti-Racist, NPR (2021), https://www.npr.org/2020/08/24/905515398/not-racist-is-not-enough-putting-in-the-work-to-be-anti-racist (last visited Feb 17, 2021).

who supports a "racist President"? A Washington D.C. Democrat venire is greatly prejudiced and socio-ethically compelled to "cancel" such a defendant by finding him guilty in the name of "social justice."[40] As stated previously, this case is political, through and through. Furthermore, the news coverage of January 6 has included incendiary rhetoric about the allegedly "racist insurrectionists." *Skilling* noted that media stories that would create prejudice for a Rule 21(a) transfer are the types that contain "blatantly prejudicial information such as *Rideau*'s dramatically staged admission of guilt." *Skilling,* 130 S.Ct. at 2902. This description is fitting for the stories that have been published in the aftermath of January 6.

Between the media's concentration on imposing the view that this was a mob of racist insurrectionists and the political response to the Capitol incident, this case is rendered into the type of exceptional circumstance that warrants a transfer of venue, as the presumption of prejudice is unavoidable.

      *iii.*    *Skilling* Factor 3: The Proximity Between Publicity and the Trial

The defense anticipates continued media coverage and involvement in the case. Each of the January 6 cases that have gone to trial have seen significant media coverage. The trial in this case is scheduled for August 1, 2022, two years and seven months after the incident. In contrast,

---

[40] "Social justice" initiates in Washington D.C. are rapidly growing in 2020 and 2021. *See, e.g.* Evan Lambert, *More automated traffic enforcement could come to Arlington in the name of social justice*, FOX 5 DC (Feb. 2021), https://www.fox5dc.com/news/more-automated-traffic-enforcement-could-come-to-arlington-in-the-name-of-social-justice; Nora Scully et al., *GU Politics fellows discuss partisanship and social justice in a post-Trump era* -, The Georgetown Voice (Feb. 15, 2021), https://georgetownvoice.com/2021/02/15/gupolitics-fellows-discuss-partisanship-and-social-justice-in-a-post-trump-era/; Donna M. Owens, Can the cannabis industry be an agent of social justice? Or is it just another big business?, The Washington Post (Jan. 25, 2021), https://www.washingtonpost.com/lifestyle/magazine/curaleaf-cannabis/2021/01/25/243339f8-56b5-11eb-a08bf1381ef3d207_story.html.

*Skilling* went to trial four years after the highly publicized origination of the case. *Skilling,* 130 S.Ct. at 2902.

> *iv.*   *Skilling* Factor 4: Evidence of Juror Partiality

*Skilling* emphasized "the kind of vivid, unforgettable information the Court has recognized as particularly likely to produce prejudice," when considering the factor of jury partiality. *Skilling*, 561 U.S. at 383. The Capitol incident was vivid and unforgettable. Of course, the media's constant replay of the imagery has made certain that no one can forget it.[41] But the imagery for D.C. residents didn't stop at the Capitol. The closure of Washington D.C. throughout January, the physical appearance of Washington D.C. as a military state for months after the Capitol incident, the restrictions on D.C. residents' movement, the nonstop media discussion about the incident, the nonstop political attacks on the individuals involved with the incident as "insurrectionists," the firing and "canceling" of individuals associated with the incident – all combine to form the type of vivid, unforgettable information that inarguably leads us to presume bias for the entire venire. The continuing presence of the National Guard, and the remaining military fencing and restrictions, serve as a daily reminder to Washington D.C. residents of the Capitol incident.

Washington D.C. residents remain actively affected by the Capitol incident and the participants, as the cases against the Capitol incident participants proceed through the justice system. Moreover, the fact that approximately 95% of the voters in D.C. voted against Donald Trump, yet the facts of this case require the jury to be entirely open-minded to a political case

---

[41] HBO is releasing a documentary on the January 6 incident on October 20, 2021. Mr. Ballard's face, bloody after being struck on the head, appears prominently in the trailer. Hulu and the New York Times have also made documentaries about the incident titled, "24 Hours: Assault on the Capitol," and "Day of Rage: How Trump Supporters Took the U.S. Capitol" respectively.

that stars Donald Trump, during a time of exceptional political divide in this country, weighs heavily on juror partiality.

Juror bias against Mr. Ballard cuts deeper, still. The current President of the United States attacked Trump supporters as "thugs, insurrectionists, political extremists, and white supremacists." Those who control the political narrative are sending a message to all prospective jurors that anything other than a guilty verdict will be unacceptable. Nancy Pelosi has made it clear that voting in favor of conviction of "insurrection" is "courage," while voting against conviction is "pathetic."[42]

According to a 2021 research paper by scientists from six U.S. universities, political positions are influencing Americans' decisions to the point of irrationality.[43] "For example, research has found that employees accept lower wages to work for politically like-minded entities," amongst other unsound decisions driven primarily by politics.[44] Political polarization "ultimately deprives individuals of intellectual diversity, among other things," the researchers concluded.[45] This research leads to the inevitable conclusion that the tribal politics of Washington D.C. are a significant risk to a fair trial by an impartial jury in a case that is entirely political, with a defendant who was marred by the media as a polarizing political figure.

Indeed, these ideas of political justice in the Capitol cases are already circulating in mainstream media. On February 16, 2021, MSNBC's Dr. Jason Johnson stated on national television, in response to the Capitol incident, "If I can bankrupt a racist, I can deal with that for

---

[42] *See Pelosi Statement on Impeachment Trial of Donald Trump*, Speaker Nancy Pelosi (Feb. 13, 2021), https://www.speaker.gov/newsroom/21321.

[43] T.J. Weber et al., *EXPRESS: Political Polarization: Challenges, Opportunities, and Hope for Consumer Welfare, Marketers, and Public Policy,* Journal of Public Policy & Marketing (March, 3, 2021), https://doi.org/10.1177/0743915621991103.

[44] *Id.*

[45] *Id.*

now *if I can't jail a racist*."[46] (Emphasis added). He then repeated this idea on Twitter, as did MSNBC.[47]

Due to the heightened political awareness in Washington D.C. and based on the findings of the 2021 Political Polarization research, D.C. jurors would be statistically more likely to skew their verdict in favor of the more politically favorable verdict – a guilty verdict – to suit their tribal-politic goals. Indeed, jurors would feel shame to even raise the possibility of a not guilty verdict in the Washington D.C. community of jurors. "Bias can infect the cognitive process from beginning to end and anywhere between," and "political commitments are very likely to give rise to bias," according to a Florida State University study on the issue of liberal bias.[48] A 2018 study of 51 experimental studies involving over 18,000 participants examined the prevalence of political bias when it challenged political beliefs or allegiances.[49] The researchers found that people exhibited a bias in favor of their own politics, that they saw information as "more valid and compelling when it confirmed rather than challenged their political affinities."[50] This is an important consideration in a political case before a jury that will showcase political issues debated by counsel.

---

[46] Jason Johnson on NAACP's insurrection lawsuit: 'If I can bankrupt a racist, I can deal with that for now if I can't jail a racist', MSNBC.com (Feb. 16, 2021), https://www.msnbc.com/deadline-white-house/watch/jason-johnson-on-naacp-sinsurrection-lawsuit-if-i-can-bankrupt-a-racist-i-can-deal-with-that-for-now-if-i-can-t-jail-a-racist-101117509813.

[47] "Given the weaknesses in our criminal justice system... as far as I'm concerned, if I can bankrupt a racist, I can deal with that for now if I can't jail a racist. And I think that a lot of people are gonna end up being bankrupt"- @DrJasonJohnson w/ @NicolleDWallace", Deadline White House @DeadlineWH (Feb. 16, 2021) https://twitter.com/DeadlineWH/status/1361825129483952133.

[48] Bo Winegard el al., *Equalitarianism: A Source of Liberal Bias* (May 8, 2018), https://ssrn.com/abstract=3175680.

[49] Peter H. Ditto et al., At Least Bias Is Bipartisan: A Meta-Analytic Comparison of Partisan Bias in Liberals and Conservatives, 14 Perspectives on Psychological Science 273-291 (2018).

[50] *Id.*

Another study found that "Liberals were consistently biased against information that portrayed privileged groups more favorably than victims' groups."[51] As the *American University Law Review* study *On the Effectiveness of Voir Dire in Criminal Cases With Prejudicial Pretrial Publicity: An Empirical Study* noted, "jurors awareness and willingness to report bias is imperfect."[52] Moreover, liberals are less aware of their personal biases.[53] This matters in jury selection, where counsel and the Court rely, to a large extent, on juror self-reporting.

Considering the community prejudice and the highly politicized environment of Washington D.C., a fair trial for Mr. Ballard is improbable. This improbability can be computed. In assessing human behavior, the United States Court of Appeals for the District of Columbia created a most fitting test: "We are concerned not simply with probabilities, but with conditional probabilities: if one event occurs, how likely is it that another event will occur?" *United States v. Prandy-Binett*, 995 F. 2d 1069, 1070 (D.C. Cir. 1993); *United States v. (Monte) Brown*, 374 F. 3d 1326, 1328 (D.C. Cir. 2004); see also *Skilling,* 130 S.Ct. at 2948 ("[A]s the tide of public enmity rises, so too does the danger that the prejudices of the community will infiltrate the jury"). The value of this analysis is to consider the effect of circumstances in the cumulative. *United States v. Prandy-Binett II*, 5 F. 3d 558, 559 (D.C. Cir. 1993). This conditional probability analysis is aptly pertinent to reviewing prospective jurors. Applying this inquiry, we can ask:

  • Out of the eligible jury pool, if 95% of D.C. voted against Donald Trump, what portion

---

[51] Bo Winegard et al., *Equalitarianism: A Source of Liberal Bias* (May 8, 2018), https://ssrn.com/abstract=3175680.

[52] Kerr, N L, et al. "On the Effectiveness of *Voir Dire* in Criminal Cases With Prejudicial Pretrial Publicity: An Empirical Study." *American University Law Review*, vol. 40, no. 2, 1991, p. 699.

[53] Cory Clark, *Are Liberals Really More Egalitarian*, Psychology Today (Feb. 28, 2021), https://www.psychologytoday.com/us/blog/theantisocial-psychologist/202102/are-liberals-really-more-egalitarian; Bo Winegard el al., *Equalitarianism: A Source of Liberal Bias* (May 8, 2018), https://ssrn.com/abstract=3175680.

of these prospective jurors will be able to remain impartial in a case involving a fact pattern of both Donald Trump and Mr. Ballard claiming that Biden lost the election and Trump won the election?

• Out of these prospective jurors, how many can remain impartial after seeing nonstop media coverage about the Capitol incident that involved Mr. Ballard?

• Out of these prospective jurors, how many can remain impartial after living through the D.C. lockdown and continuing militant patrol in response to the Capitol incident involving Mr. Ballard, without attributing blame to Mr. Ballard?

• Out of these prospective jurors, how many can remain impartial after being advised by the federal government that there is a fear of domestic terrorism and that people like Mr. Ballard, or motived by Mr. Ballard, "could continue to mobilize to incite or commit violence" near their home in Washington D.C.?

• Out of those prospective D.C. jurors, how many can remain impartial after hearing President Biden accuse Capitol arrestees like Mr. Ballard of being "insurrectionists, political extremists, and white supremacists," and other politicians parroting nearly the same?

• Out of the remaining prospective jurors, how many can remain impartial after hearing calls to conviction from the politicians and pundits who control the political ethics narrative of Washington D.C.?

• Out of these prospective jurors, how many can remain impartial after seeing numerous stories about Thomas Ballard being an "insurrectionist"?

• Out of these prospective D.C. jurors, how many can refrain from trying to punish him for his politics, or for something he is not charged, such as "insurrection"?

• Out of those prospective D.C. jurors, how many will disobey "cancel culture" and the social pressure to punish Mr. Ballard for being politically incorrect?

• Out of these remaining prospective jurors, how many will have the confidence to raise the conversation of a not guilty verdict in deliberations with juror members who might call them "racist" for even bringing up the discussion?

• Out of these prospective jurors, how many can render a not guilty verdict even if it will mean being scrutinized by the public after such a verdict, potentially being called "racist" or a "traitor" by their community after doing so?

• Out of these prospective jurors, how many can render a not guilty verdict in the face of a community seeking retribution for the militarization and unforgettable disruption of their city?

• Out of these prospective jurors, how many can render a not guilty verdict if that means letting Mr. Ballard walk free on these charges?

These inquiries can go on and on until we reach a point near absolute zero. But we do not have to. Rule 21(a) only requires a showing of a "great" prejudice against the defendant. "This analysis assumes interdependence." *Prandy-Binett II*, 5 F. 3d at 560. Indeed, the extraordinary militarization of Washington D.C. in response to the Capitol incident, combined with the obsessive media coverage of the incident, combined with particularized media attention on Mr. Ballard, combined with the devastating political linguistics aimed at characterizing all participants in the Capitol incident as terrorists, combined with malicious inaccuracies about "white supremacy" being attributed to the incident and to Mr. Ballard, combined with the district's incomparable political opposition to the politics that define the underlying case, and the

residents' large federal government employment statistics – all yield a great prejudice in Washington D.C. against Mr. Ballard.

Mr. Ballard is entitled to a fair trial. The attacks on the January 6 protestors by the media, compounded by the prejudicial community impact on Washington D.C. that arose out of the city's response to the January 6 Capitol incident, have effectuated pretrial prejudice against Mr. Ballard in Washington D.C. that is so likely to have permeated the jury pool with prejudice that the venire must be presumed as tainted. This case is the embodiment of the "huge . . . wave of public passion" that was seen in *Irvin v. Dowd.* 366 U.S. at 728. Mr. Ballard's case meets and exceeds the standard set out in Rule 21(a) and in *Skilling*.

**b.  *Voir Dire* Is Ineffective in Cases of Emotional Pretrial Publicity**

Rule 21(c) of the Federal Rules of Criminal Procedure states that "[a] motion to transfer may be made at or before arraignment or at any other time the court or these rules prescribe." The D.C. Circuit has historically preferred *voir dire* of potential jurors as a means of dealing with

pretrial publicity, instead of deciding on transfer under Rule 21(a) as raised "at or before arraignment," under Rule 21(c). See *United States v. Haldeman*, 559 F.2d 31, 60, 63-64 (D.C. Cir. 1976). Taking this position further, the D.C. Circuit had placed a burden on the defense that was higher than the standards of the Federal Rules of Criminal Procedure. Instead of requiring a showing of a great prejudice under Rule 21(a), the D.C. Circuit imposed a higher standard of "extreme circumstances." See *United States v. Edmond*, 52 F.3d 1080, 1099 (D.C. Cir. 1995); *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995). After *Skilling*, D.C. Circuit's "extreme circumstances" test became insufficient and has been replaced with the four-prong analysis as outlined *supra*. While the Supreme Court in *Skilling* did not bar a court from deferring the decision on a change of venue motion until *voir dire*, the *Skilling* court did not abrogate Rule 21 either.

While there are cases where time and thorough *voir dire* may be sufficient to correct for pretrial publicity, emotional publicity and community publicity cannot be cured through either time or *voir dire*. Of particular importance are the finding from *On the Effectiveness of Voir dire in Criminal Cases With Prejudicial Pretrial Publicity: An Empirical Study*, which found that *voir dire c*hallenges are insufficient and ineffective at weeding out biased jurors incases with prejudicial pretrial publicity.[54] "The net effect of careful *voir dire* concerning pretrial publicity, therefore, was nil, and the bias created by the publicity survived *voir dire* unscathed."[55] Furthermore, "emotional publicity" could not be cured, not even through time and continuances.[56] *See also Patton v. Yount,*

---

[54] Kerr, N L, et al., *On the Effectiveness of Voir dire in Criminal Cases With Prejudicial Pretrial Publicity: An Empirical Study*, American University Law Review, vol. 40, no. 2, 1991, pp. 665–701. Summary available: https://www.ojp.gov/library/abstracts/effectiveness-voir-dire-criminal-cases-prejudicial-pretrial-publicity-empirical.
[55] *Id*. at 697.
[56] *Id*. at 675.

467 U.S. 1025, 1031 (1984) ("[A]dverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that

they can be impartial should not be believed"). Emotional publicity was defined as the kind of sensational publicity likely to arouse an emotional response.[57]

Mr. Ballard's case is undoubtedly full of emotional pretrial publicity. The unprecedented community prejudice in Washington D.C., the unprecedented amount of political and media commentary on the criminal case, the staggering amount of emotion that charged the 2020 Presidential election, and the emotional socio-political issues at the heart of the publicity surrounding Mr. Ballard's case render this case the type of "emotional publicity" case that instill bias into the D.C. venire that cannot be cured. Nothing about the pretrial publicity and community prejudice in this case are similar in scope or magnitude to the publicity cases that came before the D.C. Circuit in the past. To apply the same principles of protection to this Capitol case as prior D.C. publicity cases would be constitutionally insufficient to preserve the defendant's Fifth and Sixth Amendment rights. Therefore, the D.C. Circuit's usual practice of deferring a motion for transfer until after *voir dire* is insufficient to protect the defendant and may result in a false sense of security with a jury panel that is inherently incapable of unbiased adjudication. The only remedy to cure the prejudicial pretrial publicity and community prejudice against the defendant is to transfer this matter to an alternative venue.

### c.  Alternative Venue: Northern District of Texas

An appropriate alternative venue for this case is the Northern District of Texas. While pretrial publicity was also prevalent in Texas, it did not compare to the level of political publicity experienced in Washington D.C., nor was the community prejudiced through the closure of their

---

[57] *Id*. at 665–701.

streets or through continuous National Guard presence. Texas residents have not been warned that domestic terrorists are threatening their hometown, and Texas is not overrun by prejudiced D.C. politics. Texas residents are not employed by the federal government in any statistically significant rates. The parties are much more likely to find objective jurors in Texas than in Washington D.C.

## IV.    CONCLUSION

Mr. Ballard has demonstrated that he faces significant prejudice in the District of Columbia, prohibitive of a fair and impartial jury trial. He rightfully has invoked his constitutional guarantee to a fair trial by an impartial jury under the Fifth and Sixth Amendments, and aptly requests a transfer of venue to Texas pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure.

Respectfully submitted,

*/s/ Andrew C. Moon*
ANDREW C. MOON
Assistant Federal Defender

## **CERTIFICATE OF SERVICE**

I, Andrew Moon, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I caused a copy of the foregoing Defendant's Motion for Transfer to be served by Electronic Case Filing ("ECF") upon Barry K. Disney, Assistant United States Attorney, United States Attorney's Office, 1331 F Street NW, Washington, DC 20005, via his email address Barry.Disney@usdoj.gov.

*/s/ Andrew C. Moon*
ANDREW C. MOON
Assistant Federal Defender

DATE:      May 31, 2022