**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-00553 (RJL)** |
| **THOMAS JOHN BALLARD,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Thomas John Ballard to 57 months' incarceration, at the approximate mid-point of the applicable guideline range of 46 to 57 months, 3 years supervised release, a $100 special assessment and $2,000 restitution.

**INTRODUCTION**

The defendant, Thomas Ballard, aggressively participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

Ballard joined the storming of the police line on the Lower West Terrace ("LWT") and assault on officers at the LWT tunnel. From approximately 2:45 to 5:05 p.m. protestors occupied the LWT.   At approximately 4:30 p.m. Ballard actively participated in the assault on officers and the Capitol in the LWT.   Ballard used a police baton to repeatedly strike and hit police officers. Ballard threw a tabletop and two other additional objects at officers.   Ballard also shined a flashlight in officers eyes to distract them while other rioters assaulted officers.   Ballard also threw a bottle of an unknown liquid at officers and pushed a piece of metal scaffolding at the officers legs.   Additionally, Ballard broke a wooden plank into several pieces which he then threw at officers and finally threw a white metal pole at officers.

The government recommends that the Court sentence Ballard to 57 months of incarceration for his conviction of violating 18 U.S.C. 11(a) and (b).   This recommendation is within the advisory Guidelines' range of 46 – 57 months, which the government submits is the correct Guidelines calculation.   A 57 month sentence reflects the gravity of Ballard's conduct, but also acknowledges his early admission of guilt.

---

Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## I.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 68, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### *Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds*

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.   Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Image 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds.   At approximately 12:45 pm, a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.   Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Image 1 as "1st Police Barricade," circled in red and marked as Area A.   At 12:52 pm, the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down

the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier.   Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.   By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Image 1.   They flooded the area labeled "Lower West Plaza" Area C on Government's Image 1, pushing against the barricade there.





*Image 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza. For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.





*Image 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).   In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.   At 2:03 pm, Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.   It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).
> All people must leave the area immediately.   This order may subject you to arrest
> and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.   On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up

onto scaffolding above and to the side of them, many of whom were hurling projectiles.   Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.   By 2:28 pm, with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.   With their defensive lines extinguished, several police officers were surrounded by the crowd.   The rioters had seized control of the West Plaza and the inauguration stage.   There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 pm to build to a torrent.





*Image 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

***Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building***

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line. *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT").   The entrance usually consists of a flight of stairs leading to a doorway.   On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long.   That tunnel led to two sets of metal swinging doors inset with glass.   On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.   The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.



*Image 5: LWT tunnel*

This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day.   "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



*Image 6: "Inauguration at the U.S. Capitol", located at https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration*

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby. Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department (MPD), were arrayed inside the doorway and guarding the entrance. Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 PM, the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at

the rioters, who continued to resist.   The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items.   Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.

**B.**    **Thomas Ballard's Role in the January 6, 2021 Attack on the Capitol**

*Approach to the Capitol*

Thomas Ballard participated in the January 6 attack on the Capitol. His crimes are documented through a series of videos provided to the FBI by concerned citizens, body worn cameras from the Metropolitan Police Department, open-source video, and surveillance footage from inside of the Capitol. Ballard is circled in red in the photographs included in this memorandum.

Ballard traveled to Washington, D.C. from Texas.   At the Capitol he was wearing blue jeans, a black hoodie, tan backpack, an "Infowars" baseball cap, gloves and at times a gas mask. Ballard arrived at the Capitol at approximately 1:50 p.m. near the scaffolding on the LWT as depicted in Image 7.   In Image 8, Ballard watched as rioters pepper sprayed police officers and eventually broke through the police line at the base of the northern scaffolding.   Ballard was in this same area when police officers deployed tear gas into the crowd of rioters.

13



*Image 7: Ballard standing among a large group of rioters at 1:50 p.m.*



*Image 8: Ballard near the tarp-covered scaffolding on the Lower West Terrance of the Capitol Buidling*

At approximately 2:05 p.m., Ballard was at the front of a line of rioters confronting officers on the north side of the West Plaza as can be seen image 9.   Government exhibit 1 is a video taken at the same time that Ballard had positioned himself on the front line of rioters confronting officers.

An audible alarm can be heard above the chaos and chanting of the crowd advising rioters to leave and that they were subject to arrest.



*Image 9: Ballard on the north side of the Lower West Terrace*

While officers were actively combatting rioters in the north corridor of the plaza, officers were positioned on a step above rioters.   Rioters were aggressively challenging officers and an officer grabbed a pole which was being wielded by a rioter.   While the officers were attempting to secure the pole from the rioter, Ballard approached the officer and assaulted the officer by striking the officer's hand which was holding the pole. See exhibit 2, 10:04 – 10:27.

15



*Image 10: screenshot from exhibit 2 at 10:25*

Eventually, the police line was overwhelmed and officers retreated for safety from the violent mob.   Ballard made his way forward toward the Capitol and eventually onto the Upper West Terrace.   Additionally, Ballard had now armed himself with a police baton as can be seen in images 11 and 12.



*Images 11and 12: Ballard holding a police baton*

16

Ballard eventually made his way to the Lower West Terrace and the tunnel area of the Capitol where some of the most violent conflict was inflicted on police officers on January 6. Ballard initially arrived at the tunnel at approximately 3:00 p.m.   He watched the violent assaults against the police inside the tunnel unfold for more than an hour before making entering the tunnel, where he joined the assaults.

At approximately 4:28 p.m. Ballard was near the entrance of the tunnel as a multiple rioters battled with police officers defending the Capitol. *See* exhibit 3 at :20 - :30. At that moment, Ballard began repeatedly assaulting police officers with numerous weapons including a piece of metal scaffolding, several pieces of a wooden plank and a white metal pole. At approximately 4:47 Ballard threw a tabletop at officers.   *See* exhibit 4 at :13.



*Image 13: Screenshot from exhibit 4 at :13*

17

Ballard then picked up an item from the ground and threw it at the officers.   *See* exhibit 4 t :20.   After searching the ground for additional projectiles, he threw what appeared to be a table leg at the officers.   *Id.* at :34.

As the battle at the mouth of the tunnel continued, Ballard remained at the front line of rioters assaulting officers and the Capitol.   At approximately 4:50 p.m., he began assaulting officers with a police baton, as shown in Government Exhibit 4 at 2:59.



*Image 14: Screenshot from exhibit 4 at 2:59*

Ballard's assault on the officers in the tunnel took another turn at 4:51 p.m., when he pointed a flashing strobe light at them in order to temporarily blind or distract them.   *Id.* at 4:17 – 4:30. Ballard then threw a cup of some unknown liquid at officers.   *Id.* at 4:41. Ballard continues his assault on officers just moments later when he slides scaffolding at the officers' feet and legs.

*Exhibit* 5. Finally, prior to leaving the battle at the tunnel, Ballard threw a pole at officers as they continued their protection of the U.S. Capitol.



*Image 15: Ballard throwing pole at officers*

### *Defendant's Statements*

Prior to leaving the Capitol grounds, Ballard gave an interview where he was asked if he penetrated the Capitol.   Ballard responded, "No. Not yet. They are holding pretty hard at the door." Later in the interview, Ballard stated the goal was to, "get in the Capitol."   When asked about the electoral vote, Ballard responded, "From what I heard, they suspended it because they are a bunch of cowards.   We scared 'em off."

19

**THE CHARGES AND PLEA AGREEMENT**

On May 18, 2022, a federal grand jury returned an Indictment charging Ballard with 10 counts, including Count Five: Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 United States Code, sections 111(a) and (b).   On July 12, 2023, Ballard was convicted of Count Five based on a guilty plea entered pursuant to a plea agreement.

## II.    STATUTORY PENALTIES

Ballard now faces sentencing on Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 United States Code, sections 111(a) and (b).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Ballard faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## III.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The Government's calculations are as follow:

Count Five: Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous

Weapon, in violation of 18 United States Code, sections 111(a) and (b).

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Use of Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(7) | Violation of 111(b) | +2 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **26** |
| U.S.S.G. §3E1.1 | Acceptance of Responsibility | -3 |
| **Total Adjusted Offense Level:** | | **23** |

*See* Plea Agreement at ¶¶ 4(A).

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 39. Accordingly, both Probation and the government calculate Ballard's adjusted offense level, after acceptance of responsibility, as 23, and his Guidelines recommended imprisonment range as 46 to 57 months. Ballard's plea agreement contains the same stipulated Guidelines range.

## IV.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Thomas Ballard's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the Congressional certification of the 2020 Electoral College vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Ballard

21

was a very active participant in the assault on the Capitol and the officers defending the Capitol. He used numerous weapons and devices in order to attempt to overwhelm the officers and breach the Capitol. The nature and circumstances of Ballard's offense[s] were of the utmost seriousness, and fully support the government's recommended sentence of 57 months.

**B.  The History and Characteristics of the Defendant**

Ballard's use of weapons and assault on police on January 6 was not his first brush with the criminal justice system as an adult. Ballard was sentenced to a term of probation in 2010 in Eastland County, Texas state court for evading law enforcement officials. PSR ¶ 37. Because that sentence is now more than 10 years old, it did not generate any criminal history points. He was sentenced to probation again in 2013 in Tarrant County, Texas state court for unlawful possession of a weapon, resulting in one criminal history point. PSR ¶ 38.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Ballard's criminal conduct on January 6 was the epitome of disrespect for the law. Ballard's conduct was much more than political protest.   As Judge Jackson wrote, "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[2] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Ballard was a violent and active participant in the January 6 riot.   His assaultive conduct was repetitive and directed at officers over a significant period of time.    Ballard has shown little to no remorse for his conduct on January 6 and a lengthy sentence is warranted.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007)

---

[2] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

(quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of

sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[3]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[4]

---

[3] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[4] A routinely updated table providing additional information about the sentences imposed on other

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Robert Scott Palmer*, 21-cr-328, the defendant's conduct was similar to Ballard's in several respects.   Like Ballard, Palmer threw several objects at police officers in the tunnel.   Like Ballard, Palmer scavenged for items to throw at the officers.   Additionally, Palmer sprayed officers with a fire extinguisher. Like Ballard, Palmer failed to show remorse for his actions. Like Ballard, Palmer pleaded guilty to a violation of 18 U.S.C. § 111(b) but had a higher Guidelines range than Ballard. Judge Chutkan sentenced Palmer to 63 months' incarceration, 36 months' supervised release, and $2,000 restitution.   Balancing the aggravating and mitigating factors between Ballard and Palmer, a sentence of 57 months incarceration for Ballard would not create an unwarranted disparity.

Another case similar case is *United States v. Nicholas Languerand*, 21-cr-353.   Like Ballard, Languerand watched the assault on officers at the tunnel prior to joining the assault on officers himself.   Languerand and Ballard both threw a variety of dangerous objects at police as part of their assault on officers.   Additionally, neither Languerand nor Ballard have shown

Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

remorse for their violent actions.   Like Ballard, Languerand pleaded guilty to a violation of § 111(b). Judge Bates sentenced Languerand to a period of 44 months for the conviction of the same charge as the defendant has been convicted. Again, a sentence of 57 months' incarceration for Ballard would not create an unwarranted disparity, since Languerand received a below-Guidelines range sentence.

## V.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

under 18 U.S.C. § 3663(a)(3), that Ballard must pay $2,000 in restitution, which reflects in part the role Ballard played in the riot on January 6.[6] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Ballard's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 92.

---

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VI.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 57 months' incarceration, at the approximate mid-point of the applicable guideline range of 46 to 57 months, 3 years supervised release, a $100 special assessment and $2,000 restitution.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:    */s/ Zachary Phillips*
ZACHARY PHILLIPS
Assistant United States Attorney
CO Bar No. 31251
Capitol Riot Detail
United States Attorney's Office, Detailee
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: (720) 281-1611
Zachary.phillips@usdoj.gov

29